Richard L. LYONS, a/k/a Walter Lyons, Appellant,

v.

UNITED STATES, Appellee.

Pamela K. COOPER, Appellant,

v.

UNITED STATES, Appellee.

Nos. 89–CF–250, 89–CF–299.

District of Columbia Court of Appeals.

Reargued En Banc Jan. 19, 1995.

Decided Oct. 3, 1996.

W. Gary Kohlman, Washington, DC, with whom Richard T. Brown was on the supple-

mental brief, for appellant Lyons. Brenda Grantland, Washington, DC, was on the original brief.

Daniel M. Schember, appointed by the court, Washington, DC, for appellant Cooper.

Roy W. McLeese, III, Assistant United States Attorney, with whom Jay B. Stephens, United States Attorney at the time the brief was filed, and John R. Fisher, Terence J. Keeney, and Peter R. Zeidenberg, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, C.J., FERREN, TERRY, STEADMAN, SCHWELB, KING and RUIZ, JJ., and KERN, Senior Judge.

TERRY, Associate Judge.

This case arises from a murder for hire committed in the course of appellants' cocaine-selling operation. After a three-week trial, a jury found appellant Lyons guilty of first-degree murder while armed,[1] assault with a dangerous weapon (ADW),[2] and conspiracy to distribute cocaine;[3] appellant Cooper was found guilty of second-degree murder while armed,[4] ADW, conspiracy to distribute cocaine, and carrying a pistol without a license.[5] Both Lyons and Cooper appealed, and in *Lyons v. United States,* 606 A.2d 1354 (D.C.1992), a division of this court reversed their convictions and ordered a new trial. Although the division rejected most of their claims of error, it held that the government's inadvertent failure to identify one of its witnesses during jury selection had violated appellants' Sixth Amendment right to an impartial jury, and that appellants' motion for a mistrial, made after this violation had come to light, should have been granted.

After the government filed a petition for rehearing or rehearing en banc, the division vacated its original opinion, granted the petition for rehearing, and instructed the parties in an order to file supplemental briefs "addressing the issue of whether the trial court's denial of the motion for mistrial, based on

the association between a juror and a government witness, was or could be harmless error. *See, e.g., Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)." After considering the supplemental briefs and hearing further argument, the division concluded on rehearing that this error was not harmless; accordingly, it once again reversed and remanded for a new trial. *Lyons v. United States,* 645 A.2d 574 (D.C. 1994).

The government once again sought rehearing en banc, which was granted. *Lyons v. United States,* 650 A.2d 183 (D.C.1994). Now, after additional briefing and argument on the peremptory challenge issue, the court en banc holds that errors adversely affecting the exercise of peremptory challenges are not structural errors within the meaning of *Fulminante* and, absent a showing of actual juror bias, do not require reversal *per se.* To the extent that this holding is inconsistent with language in prior opinions of this court, those decisions are hereby overruled. *See, e.g., Wilson v. United States,* 606 A.2d 1017, 1025 (D.C.1992); *Cash v. United States,* 553 A.2d 215, 217 & n. 3 (D.C.1989); *Williams v. United States,* 552 A.2d 510, 512 & n. 5 (D.C.1988); *Wells v. United States,* 515 A.2d 1108, 1111 (D.C.1986). We further conclude, on the facts of this case, that the trial court's denial of appellants' motion for mistrial was not reversible error.

I

Appellants operated a cocaine-selling business in the area of North Capitol and O Streets, Northwest. Lyons would cut, package, and supply cocaine to other persons known as "runners," who would then sell the drug on the street. Cooper was one of Lyons' intermediate distributors as well as a runner. Sometime in the summer of 1985, Stephen Royster, also known as Rex, began to cause problems for appellants by stealing cocaine from them and their runners. Finally, in early February 1986, Lyons ap-

1. D.C.Code §§ 22–2401 and 22–3202 (1989).

2. D.C.Code § 22–502 (1989).

3. D.C.Code § 33–549 (1993).

4. D.C.Code §§ 22–2403 and 22–3202 (1989).

5. D.C.Code § 22–3204 (1989).

proached Daniel Roy and offered him money and cocaine to kill Royster. After initially hesitating, Roy accepted the offer.[6]

On February 26 Roy was selling cocaine for Lyons on North Capitol Street when Royster approached him and asked where Lyons was. Roy replied that Lyons was around the corner, and Royster went to talk with him. Roy then told another runner, Derrick Wimple, to "go get the pistol" because, Roy testified, he "figured that was the time" to kill Royster. Wimple went to Cooper's house, which was a short distance away on North Capitol Street, and there Cooper gave him a .38 caliber revolver. He brought the gun back to Roy, who then walked up to Royster on the street and shot him several times. After the shooting, Roy walked "nine steps" down the street to Cooper's house, handed her the gun, and left the area. According to Roy's testimony, Cooper was standing outside in front of her house and saw the shooting take place. Royster died two weeks later of his wounds.[7]

Jury selection in this case extended over two days. At the end of the first day, after nine jurors had been chosen, there were no more venire members left. Consequently, a new venire had to be summoned on the second day so that the remaining three jurors and three alternates could be chosen. A full *voir dire* of the second venire was conducted on the second day. Each day, as part of the *voir dire* of both venires, counsel for the parties identified, in person or by name, the witnesses who might be called during the course of the trial. On the second day of jury selection, however, the prosecutor named four additional witnesses whom he had not mentioned the previous day, one of whom was Detective James McCoy of the Metropolitan Police.

Very late in the trial, the court and all counsel learned for the first time that a juror selected on the first day of *voir dire* knew Detective McCoy, one of the government witnesses whose name had been inadvertently omitted by the prosecutor in his identification of the witnesses that day. About a half-hour after the jury began its deliberations, McCoy informed the prosecutor that he had recognized one of the female jurors when he had testified two days earlier.[8] The prosecutor immediately reported this fact to the trial judge, who halted jury deliberations and held a hearing at which both the juror and Detective McCoy testified.

At that hearing the judge noted that the juror in question had been chosen on the first day of *voir dire*, and that on that day the prosecutor had not mentioned McCoy as a prospective witness, nor were the prospective jurors asked whether any of them had any relatives or close friends in law enforcement. The testimony established that five years earlier Detective McCoy had had a partner with whom the juror had been romantically involved, and that McCoy had seen the juror "on occasion" when his partner picked her up after work. The former partner had been married at the time of his relationship with the juror. McCoy said that he had not seen the juror and his former partner together for two years. He also explained that during his brief trial testimony he did not see the juror sitting in the jury box until he was leaving the witness stand, at which time she "just smiled" at him. The next day, McCoy testified, the juror had called his office and asked for his former partner. When McCoy responded by asking if the jury had reached a verdict, she said they had not, and the conversation ended. The juror testified similarly about the circumstances under which she and McCoy were acquainted and about the phone call.[9]

6. In accordance with a plea bargain, the government agreed to let Roy plead guilty to second-degree murder in return for his full cooperation in the investigation and prosecution of all the other persons involved in the shooting of Stephen Royster.

7. Roy left town for several days after the shooting. After he returned to the North Capitol Street neighborhood, he ran into Lyons on the street one day. Lyons gave him $1500, but neither of them said anything to the other.

8. Detective McCoy had testified very briefly at trial about a conversation he had had with Lyons in which Lyons had told him that he was employed.

9. The juror's testimony was slightly inconsistent. At first she said that when McCoy asked her if

After the hearing, the juror was permitted to return to the jury room, and the jury resumed its deliberations. Counsel for both appellants moved for a mistrial on the ground that the juror was prejudiced, but they made no claim that they had been denied the opportunity to exercise a peremptory challenge. The court denied their motions.

## II

■ Initially, we conclude that the prosecutor's inadvertent failure [10] to name Detective McCoy as a potential government witness on the first day of *voir dire*—when the juror who knew McCoy was chosen—prevented appellants from exploring possible juror bias and from excluding the juror by the use of a peremptory challenge.[11] The preferable cure for this abridgment of appellants'

right of peremptory challenge would have been to exclude the juror from the panel before the start of jury deliberations. If defense counsel, at the time Detective McCoy was sworn as a witness, had brought to the court's attention the fact that McCoy had not been introduced to some of the jurors, the challenged juror could still have been replaced with an alternate.[12] Unfortunately, since neither the judge nor the prosecutor learned of the connection between the juror and Detective McCoy until after deliberations had begun, the only curative option available to the judge at that point was to grant the defense motion for a mistrial.[13] Assuming solely for the sake of argument, and without deciding, that the denial of that motion would have been error if appellants had claimed that they had been denied their right of peremptory challenge, we turn to the questions that prompted us to rehear this

the jury was still deliberating, "I asked him why, and then I hung the telephone up." A moment later, however, she said, "He asked me ... had they voted, and I asked him why, then he hung the telephone up.... Hung up when I asked him why." McCoy did not specifically say whether he or the juror terminated the conversation by hanging up the phone, but for the purposes of this appeal it does not matter.

**10.** Appellants make no claim that the prosecutor deliberately, or in bad faith, failed to mention McCoy's name at the critical time during the *voir dire*. Nor is there any basis in the record for believing that his failure was anything other than inadvertent, as he said it was. We note that it was the prosecutor himself who first brought his own lapse to the court's attention after McCoy told him that he had recognized the juror as he was leaving the witness stand; neither defense counsel nor the court had been aware of the omission until then.

**11.** It is worth noting that appellants did not use all of their peremptory challenges, so that either of them could have struck the juror if the information about her prior acquaintance with Detective McCoy had been revealed during the *voir dire*. Indeed, appellant Lyons asserts in his brief, in an argument adopted by appellant Cooper:

From the pattern of peremptory challenges exercised, it appears certain that the defense would have stricken [the juror] had they known she was acquainted with a potential government witness. On the [first day of *voir dire*], three jurors said they recognized police officers from the group of potential government witnesses; all three were stricken—one

for cause and two through peremptory challenges.

Given the record before us and this specific claim by both appellants, we cannot conclude that the defense "would not have exercised its ... peremptory challenge if this juror's recognition of [McCoy] had been disclosed during voir dire." *Shannon & Luchs Management Co. v. Roberts*, 447 A.2d 37, 44 (D.C.1982).

**12.** In his separate opinion, Judge Ferren states that the prosecutor was "duty-bound" to introduce Detective McCoy to all prospective jurors before trial, that "everyone agrees" with this proposition, and that the prosecutor's omission denied appellants "a basic protection inherent in the framework of a fair trial." *Post* at 1075. The Superior Court's Rules of Criminal Procedure, however, do not require the introduction of prospective witnesses, in person or by name, to prospective jurors. To the extent, if any, that the sound practice of introducing witnesses to the jury panel during *voir dire* may be viewed as mandatory, *see, e.g., United States v. Brown*, 799 F.2d 134, 136–137 (4th Cir.1986), such an obligation applies equally to the prosecution and to the defense.

**13.** As Judge Ferren points out, however, *post* at 1078 n. 8, a 1995 statute now provides an alternative remedy. Under D.C.Code § 16–705(c) (1996 Supp.), "if, due to extraordinary circumstances, the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court, a valid verdict may be returned by the remaining eleven jurors." We need not decide whether the situation here gave rise to "extraordinary cir-

case en banc: Must we reverse appellants' convictions regardless of their failure to show any prejudice, as our own precedents dictate? Or may we determine, in light of recent case law from the Supreme Court, that the (assumed) error was not plain error, and affirm the convictions?

More than a century ago, the Supreme Court said that the right to strike jurors without cause is "one of the most important of the rights secured to the accused.... Any system for the empanelling of a jury that prevents or embarrasses the full, unrestricted exercise by the accused of that right, must be condemned." *Pointer v. United States,* 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894). Following *Pointer* and other cases, this court has repeatedly held that although the right of peremptory challenge is not specifically guaranteed by the Constitution, it must be "regarded as necessary to a fair and impartial trial." *Wells v. United States, supra,* 515 A.2d at 1110 n. 1 (citations omitted).[14] Given the importance of this right, we held in *Wells* that if it is denied or impaired in a criminal case, "the defendant need not demonstrate prejudice to obtain reversal of a conviction." *Id.* at 1111; *accord, e.g., Williams v. United States, supra,* 552 A.2d at 512. In light of recent Supreme Court case law, however, we are persuaded that this rule should be reconsidered.

In *Arizona v. Fulminante, supra,* the Supreme Court was called upon to decide whether the admission of a coerced confession might be harmless error. The Court concluded that it was, after reviewing its past decisions on the availability of a harmless error analysis with respect to other types of error. In reaching its conclusion, the Court drew a clear distinction between mere "trial errors" and errors which amounted to "structural defects" in the trial itself. Discussing several cases in which it had found particular errors to be harmless, even harmless beyond a reasonable doubt,[15] the Court said:

The common thread connecting these cases is that each involved "trial error"—error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt. *Id.* at 307–308, 111 S.Ct. at 1264 (Rehnquist, C.J.).[16] In contrast, the Court observed that the relatively few cases in which it had ruled that certain errors were not harmless had involved "structural defects in the constitution of the trial mechanism," *e.g.,* deprivation of the right to counsel, trial before a biased judge, exclusion of members of the defendant's race from the grand jury, the right to self-representation, and the right to a public trial. *Id.* at 309–310, 111 S.Ct. at 1264–1265 (citing cases). Such an error can never be harmless, the Court explained, because in each instance "[t]he entire conduct of the trial from beginning to end is obviously affected" by the error. *Id.* at 309–310, 111 S.Ct. at 1265. These latter "structural" defects are not amenable to the usual harmless error analysis because they "affect the framework within which the trial proceeds," unlike mere trial errors which affect only "the trial process itself." *Id.* Without basic structural protections, the trial " 'cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' " *Id.* (quoting *Rose v. Clark,* 478 U.S. 570, 577–578, 106 S.Ct. 3101, 3105–3106, 92 L.Ed.2d 460 (1986)). Thus drawing the line between "trial errors" and "structural defects," the Court concluded that the admission of a coerced confession was a "classic 'trial error,' " *Fulminante,*

---

cumstances," but note only that this statute was not in effect at the time of appellants' trial.

**14.** The right of peremptory challenge is protected by statute in the District of Columbia. *See* D.C.Code § 11–1908(b)(2) (1995) ("An individual summoned for jury service may be ... excluded upon peremptory challenge as provided by law"). *See also* Super. Ct.Crim. R. 24(b) (prescribing procedures for the exercise of peremptory chal-

lenges); *Taylor v. United States,* 471 A.2d 999, 1004 (D.C.1983) (rule "secures the right to challenge jurors without cause").

**15.** *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

**16.** In this portion of his opinion, Chief Justice Rehnquist was writing for a majority of the Court.

499 U.S. at 309, 111 S.Ct. at 1264, so that even the admission of a coerced confession might be harmless.

Critical to the Court's distinction between these two types of errors is that the category of "structural defect" discussed in *Fulminante* is limited to fundamental constitutional errors. The Court repeatedly referred to those defects it deemed "structural" as "constitutional errors," "constitutional deprivations," or "constitutional violations." *See, e.g., id.* at 310, 111 S.Ct. at 1265. Subsequent decisions have made clear that *Fulminante*'s discussion of "structural defects" applied only to certain constitutional errors that were too fundamental to be harmless. *See, e.g., United States v. Olano,* 507 U.S. 725, 734–736, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993) (citing *Fulminante* as holding that constitutional error cannot be found harmless if it deprives defendant of "basic protections"); *Brecht v. Abrahamson,* 507 U.S. 619, 629–630, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993) (defining one end of "the spectrum of constitutional errors" as containing "structural defects" which require "automatic reversal ... because they infect the entire trial process," whereas mere "trial errors" at the other end of the spectrum are "amenable to harmless-error analysis"). Other federal courts have followed the Supreme Court's lead. *See, e.g., Duest v. Singletary,* 997 F.2d 1336, 1338 n. 3 (11th Cir. 1993) ("Structural defects ... involve deprivations of constitutional protections so basic that in their absence no criminal trial can be deemed reliable"), *cert. denied,* 510 U.S. 1133, 114 S.Ct. 1107, 127 L.Ed.2d 418 (1994).

Since it has been settled for decades that the right of peremptory challenge is not a constitutional right at all, let alone a "basic" or "fundamental" constitutional right, *see Stilson v. United States,* 250 U.S. 583, 586, 40 S.Ct. 28, 29–30, 63 L.Ed. 1154 (1919), it follows from *Fulminante* that any error relating to the use of peremptory challenges cannot be regarded as a "structural defect." Thus in *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), the Court

held that a trial court's refusal to excuse a juror for cause (thereby forcing the defendant to use one of his remaining peremptory challenges), though erroneous, did not require reversal because the jury that actually heard the case was impartial. Despite the special importance historically attached to the right of peremptory challenge, the Court reiterated that "peremptory challenges are not of constitutional dimension," but are simply "a means to achieve the end of an impartial jury.... [T]he fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Id.* at 88, 108 S.Ct. at 2278. *See also State v. Di Frisco,* 137 N.J. 434, 470 & n. 1, 645 A.2d 734, 753 & n. 1 (1994) (holding that in order to win reversal, defendant must show that "a juror who was partial" sat as a result of loss of a peremptory challenge, and noting that several federal circuits and twenty-two states have held "that a peremptory challenge is not a fundamental constitutional right"). We therefore conclude that the abridgment of appellants' right of peremptory challenge in this case does not warrant automatic reversal as a "structural" error.[17]

■ We turn next to the government's argument that appellants must demonstrate plain error because their motion for a mistrial did not claim that their right of peremptory challenge was infringed by the continued presence of this particular juror on the jury. We agree with the government on this point. Appellants' mistrial motion was based solely on their assertion that the juror was biased; the court found no basis for a mistrial and denied the motion. Whether appellants would have exercised one of their peremptory challenges against the juror had they known about her contact with Detective McCoy was an issue left entirely unexplored, notwithstanding their present assertion (see note 11, *supra*) that they would have struck the juror if they had known at the time that she was "acquainted with a government witness." Moreover, this court has held that

---

**17.** We need not decide whether an error that would otherwise be reversible *per se* is subject to a less stringent test when it is not objected to in the trial court. *See United States v. Merlos,* 303

U.S.App. D.C. 395, 8 F.3d 48 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1635, 128 L.Ed.2d 358 (1994).

the belated discovery of information about a juror which would have caused the defendant to use a peremptory challenge against her is an insufficient basis for reversing the denial of a motion for a mistrial. *Harris v. United States,* 606 A.2d 763, 765–767 (D.C.1992). "The possible deprivation of the exercise of a peremptory challenge does not mandate reversal because the relevant issue is whether the juror was actually biased against the defendant." *Id.* at 766 n. 5 (citations omitted). In this case the trial judge, although he did not expressly find that the juror was not biased, said at the end of the hearing that he was "not persuaded within a million miles that there is grounds for a mistrial." Since the mistrial motion had been based solely on the assertion that the juror was or might be "influenced" by her contact with Detective McCoy, we read this statement as an implicit finding that she was not so "influenced"—*i.e.,* that she was not biased.[18]

The plain error rule, Super. Ct.Crim. R. 52(b),[19] has two components. First, in order to be "noticed" under the rule, an error must be "plain"—that is, "obvious or readily apparent." *United States v. Young,* 470 U.S. 1, 16 n. 14, 105 S.Ct. 1038, 1047 n. 14, 84 L.Ed.2d 1 (1985); *see United States v. Olano, supra,* 507 U.S. at 734, 113 S.Ct. at 1777 (error must, at a minimum, be "clear under current law"). Second, the rule states that the error must "affect[ ] substantial rights"—that is, it must be "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc) (citations omitted); *see Olano, supra,* 507 U.S. at 734, 113 S.Ct. at 1778 (error "must have affected the outcome of the [trial court] proceedings"). Neither requirement is met here. As to the first, we need only observe that, in light of such cases as *Ross v. Oklahoma* and *Harris v. United States,* the supposed infringement of appellants' right of peremptory challenge was neither "obvious" nor "clear under current law." As to the

second, we are satisfied that the fairness and integrity of the trial were not jeopardized. Not only was there no actual bias, but Detective McCoy's testimony had no bearing on appellants' guilt or innocence. McCoy testified only that on the date of the shooting he went to the 1400 block of O Street, N.W., and that after he arrived, he met Lyons. He testified further that he spoke to Lyons later in the Homicide Squad office at the police station, and that during this conversation Lyons told him he was employed. These matters were undisputed and of little or no significance. McCoy's testimony consumed only a few minutes in a three-week trial. On this record we can find no basis for concluding that the trial court committed plain error.

In sum, we conclude that the circumstances surrounding the prosecutor's inadvertent failure to identify Detective McCoy as a witness resulted in an abridgment of appellants' right of peremptory challenge. We hold, however, that because the right of peremptory challenge is not a constitutional right, its violation must be viewed as a "trial error" and not a "structural defect" under *Arizona v. Fulminante.* We further hold that because the peremptory challenge issue was not raised below, it must be considered on appeal under the plain error rule. We find no prejudice affecting substantial rights, and hence no plain error.

The remaining issues on appeal are referred back to the division, whose opinion is issued simultaneously with this en banc opinion.

*It is so ordered.*

RUIZ, Associate Judge, concurring:

I concur with the majority opinion and write separately to disagree with only one point, unnecessary in light of the majority's reliance on a plain error standard of review, that "because the right of peremptory challenge is not a constitutional right, its violation must be viewed as a 'trial error' and not

---

18. We are satisfied that the hearing which the judge held was sufficient to enable him to determine whether the telephone conversation between the juror and Detective McCoy showed that the juror was biased or whether the conversation itself might have engendered bias.

19. Rule 52(b) states in its entirety:

Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

a 'structural defect' under *Arizona v. Fulminante.*" *See ante* at 1072. I agree with the thrust of Judge Ferren's analysis that whether a right has a constitutional basis and whether it is "structural" in nature are not necessarily the same thing for purposes of deciding whether automatic reversal is required if an appellate court finds a violation of the right.

The Supreme Court's opinions in *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), and the cases cited therein, deal only with constitutional rights and do not say one way or another whether a non-constitutional right may be "structural" in the sense that reversal is required if the right is violated. *Fulminante* is binding on us only with regard to federal issues. *Chapman v. California,* 386 U.S. 18, 21, 87 S.Ct. 824, 826, 17 L.Ed.2d 705 (1967) ("The application of a state harmless-error rule is, of course, a state question where it involves only errors of state procedure or state law.").

*Fulminante* is nonetheless instructive in this case involving a non-constitutional right because it explains that what requires *per se* reversal in the case of what are referred to as "structural defects" is that it is impossible or virtually impossible for an appellate court to evaluate whether such an error was harmless—either because it would be too speculative (for example, in the case of an uncounseled client with a Sixth Amendment right to counsel, how do you know what counsel would have done?) or because it offends such a rock-bottom notion of fairness (for example, the impartiality of the judge) that we are not willing even to contemplate such a procedure. This view is merely the other side of Chief Justice Rehnquist's observation that "trial errors" are subject to harmless error analysis (even when they violate constitutional rights) because they can be "quantitatively assessed in the context of other evidence presented" to the jury. *Fulminante, supra,* 499 U.S. at 308, 111 S.Ct. at 1264.

An error is "structural" and requires *per se* reversal, on the other hand, because it cannot be so quantitatively assessed. *See id.* at 309–10, 111 S.Ct. at 1265 ("The entire conduct of the trial from beginning to end is obviously affected by the absence of counsel for a criminal defendant, just as it is by the presence on the bench of a judge who is not impartial."); *Sullivan v. Louisiana,* 508 U.S. 275, 279–81, 113 S.Ct. 2078, 2082, 124 L.Ed.2d 182 (1993) (quoting from *Fulminante* that "structural defects in the constitution of the trial mechanism ... defy analysis by 'harmless-error' standards"). Although it is possible, perhaps even likely, that most "structural" rights are protected by the Constitution, logic does not dictate that all "structural" rights—defined as those the deprivation of which cannot be quantitatively assessed on appeal—have a constitutional basis.

Applying that standard of "assessability" to the error in this case, I conclude that the prosecution's inadvertent failure to disclose the name of one of its witnesses the first day of *voir dire,* even assuming that it hampered the appellants' exercise of peremptory challenges, can be assessed to have been harmless based on the judge's implicit finding that the juror was not biased, *see ante* at 1072, and the advanced stage of the proceedings. Although peremptory challenges are subjectively exercised, their value to our system of justice is as "a means to achieve the end of an impartial jury." *Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988). Where the jury's impartiality is not in question, we may also take into account other values such as conservation of judicial resources and preservation of jury deliberations that are not improperly tainted, in deciding whether the infringement of the right to peremptory strikes suffered by appellants requires reversal when viewed in the context of harm to the system as a whole. In this case, objection was made after a trial had been conducted and jury deliberations had begun. *Per se* reversal would mean the loss of those invested judicial resources. Because that loss is not outweighed in this case by a claim of juror bias, reversal is not required. *Cf.* D.C.Code § 23–105(d) (1996) (prohibiting setting aside verdicts based on challenges to jurors that could have been asserted before the jury was sworn unless, *inter alia,* the juror "had a bias against the defendant such as would have disqualified him"). Therefore, but for application of a

plain error standard of review, a harmlessness analysis would be appropriate in this case because the analysis can be conducted and the convictions affirmed because the error was harmless.

FERREN, Associate Judge, dissenting in part and concurring in the result:

This case concerns the prosecutor's inadvertent failure to disclose a government police witness to the jury panel during *voir dire,* followed by a juror's private communication with the police witness—an acquaintance of the juror—during the trial. The majority does not dispute the defense representation that, if the government had timely disclosed its witness to the jury panel, the defense would have used a peremptory strike against the juror, who presumably would have acknowledged she knew the witness. See *ante* at 1069 & n. 11. The majority, moreover, is willing to assume for sake of argument that, if appellants could demonstrate they had preserved for review their claimed right to the peremptory strike, the trial court would have erred in failing to grant the requested mistrial. See *ante* at 1069–1070. The majority, however, does not go very deeply into the mistrial issue, because it concludes that appellants have not, in fact, preserved their argument. After pointing out that peremptory strikes are not a matter of constitutional right and concluding, as a result, that there was no "structural error" warranting automatic reversal under *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the majority shifts its review to plain error, rather than harmless error, and concludes there was no prejudice affecting substantial rights. This analysis, I believe, is unsatisfactory.

## I.

It is important to put the discussion in context by addressing, first, the line of decisions that appears to underlie the court's ruling: the "mistaken juror" cases. These are cases in which a juror has honestly failed to answer a *voir dire* question correctly, and thus has failed to disclose information that defense counsel—learning of it after submission of the case to the jury—uses to seek a

mistrial on the ground that the defense had been deprived of an inevitable peremptory strike. *See, e.g., McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) (in personal injury case, juror mistakenly failed to answer *voir dire* question seeking information about previous injuries that resulted in disability or prolonged pain to members of juror's immediate family when in fact juror's son had sustained broken leg as result of exploding tire); *Harris v. United States,* 606 A.2d 763 (D.C.1992) (in armed robbery case, juror who misunderstood question failed to disclose on *voir dire* that her son had been convicted of crime within past ten years).

In that kind of case, the Supreme Court has held that the defendant is not entitled to a new trial unless he or she can "demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause." *Greenwood,* 464 U.S. at 556, 104 S.Ct. at 850; *see Harris,* 606 A.2d at 765–67. The Court stressed that

> [o]ne touchstone of a fair trial is an impartial trier of fact—"a jury capable and willing to decide the case solely on the evidence before it." *Voir dire* examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors.

*Greenwood,* 464 U.S. at 554, 104 S.Ct. at 849 (citations omitted). Thus, reversal is permitted only upon a showing of actual bias, not for mere loss of a peremptory strike. *See id.* at 555–56, 104 S.Ct. at 849–50; *Harris,* 606 A.2d at 766 n. 5 (citing *Greenwood* ).

The rationale underpinning this "actual bias," *id.,* limitation on the loss of peremptory strikes in "mistaken juror" cases is the interest in finality that would be ill-served by "recreat[ing] the peremptory challenge process" when "jurors from all walks of life," many of whom "may be uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges," make "mistaken, though honest, response[s] to a question." *Greenwood,* 464 U.S. at 555, 104 S.Ct. at 849–50. Such mistakes are bound to happen. Thus, according to the Court, ab-

sent actual bias of a juror who is later found to be unsuitable, the justice system should not be forced to pay the price of a new trial for the unpreventable loss of a peremptory strike; that would be "insist[ing] on something closer to perfection than our judicial system can be expected to give." *Id.*[1]

It is important to understand that, in these mistaken juror cases, all the basic protections for a fair trial have been in place: for example, an unbiased judge, competent counsel, the correct number of jurors, and a jury *voir dire* procedure carried out by the book. The only flaw was an honest mistake by a layperson who could not have been faulted in any way for misunderstanding a lawyer's question. In short, the principal actors charged with administering the criminal justice system could not readily have prevented what happened.

In contrast, in this case the prosecutor, however inadvertently, broke a basic rule underlying a fair *voir dire* procedure. The prosecutor—an officer of the court—failed to show the venire panel a witness whom everyone agrees the prosecutor was duty-bound to reveal to all prospective jurors before trial, and whom the defense—again, all agree— would have peremptorily stricken.[2] This case, therefore, is analogous to those where there is a so-called "structural defect," *i.e.,* an omission of a basic protection inherent in the framework of a fair trial. This kind of defect, as we shall see, has typically made a finding of harmless error considerably more difficult than in the honest-juror-mistake cases.

As the majority points out, the term "structural defect" originated in *Fulminante,* where the Supreme Court distinguished be-

tween "structural defects" and "trial errors" in assessing, respectively, whether constitutional errors were reversible *per se* or subject to harmless error review. Because peremptory strikes are not a constitutional right, *Fulminante* automatically pushes a case involving peremptory challenges into the harmless error, not *per se* reversible error, category. On the other hand, because the type of error here, while not of constitutional magnitude, is structural in nature, the harmless error issue is more complicated than usual.[3]

In *Fulminante,* Chief Justice Rehnquist defines "trial error" as "error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Id.,* 499 U.S. at 307–08, 111 S.Ct. at 1264. He then defines "structural defects" as defects "affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. 'Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' *Rose v. Clark,* 478 U.S. at 577–78 [, 106 S.Ct. at 3106] (citation omitted)." *Fulminante,* 499 U.S. at 310, 111 S.Ct. at 1265.

The *voir dire* procedure for selecting a jury is premised, among other things, on the government's disclosing to prospective jurors all the witnesses it plans to call so that relationships between witness and juror that could give rise to challenge for cause, or to peremptory challenge, will be disclosed in

---

1. The Court in *Greenwood* was applying the federal harmless error statute and rule of procedure. It is interesting to note that this court, in assessing prejudice in mistaken juror cases, has been willing to factor in the asserted loss of a peremptory strike as part of the calculus. *See Harris,* 606 A.2d at 766; *Shannon & Luchs Management Co., Inc. v. Roberts,* 447 A.2d 37, 45 (D.C.1982).

2. This is not a case where it later was revealed that a juror and witness knew each other but there was no contact during the trial and it was questionable whether the defense would, under

all the circumstances, have used a peremptory challenge. *See Shannon & Luchs,* 447 A.2d at 44.

3. The majority is willing to assume "solely for the sake of argument, and without deciding," that the error here (if preserved) was the trial court's refusal to grant a mistrial. See *ante* at 1070. If that was error, I do not understand how such an error could ever be harmless. The very statement of the error itself is a pronouncement of reversible error; otherwise, a defendant, unquestionably entitled to a new trial, would stand convicted.

time to prevent the seating of a juror tainted by such a relationship. *See United States v. Brown,* 799 F.2d 134, 136 (4th Cir.1986) (disclosing witnesses' names necessary so that venirepersons can respond to questions concerning bias); *United States v. Anderson,* 626 F.2d 1358, 1374 (8th Cir.1980) (whether jurors are acquainted with witnesses is "clearly important to the question of the juror's impartiality"); *United States v. Baldwin,* 607 F.2d 1295, 1297 (9th Cir.1979) (exposing juror's acquaintance with witness necessary to "afford [defendant] an opportunity to exercise his [or her] peremptory challenges intelligently"). Accordingly, when the prosecutor fails, for whatever reason, to disclose all such witnesses to all prospective jurors, the structural guarantee of a fair jury selection procedure is compromised. Unlike a mistaken juror situation,[4] this is the kind of breakdown in the process that the responsible official, the prosecutor, easily can—and should—prevent.[5]

Furthermore, whatever its fate in the mistaken juror cases, the loss of a peremptory strike is no minor matter. The Supreme Court (as well as this court) has given the right to peremptory challenges close to the same status as constitutional rights (though they are not such). For example, in *Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965), the Court called peremptory challenges " 'one of the most important of the rights secured to the accused,' "[6] a statement repeated in *Ross v.*

*Oklahoma,* 487 U.S. 81, 89, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988), and in this court's decisions in *Wilson v. United States,* 606 A.2d 1017, 1025 (D.C.1992); *Cash v. United States,* 553 A.2d 215, 217 (D.C.1989); *Williams v. United States,* 552 A.2d 510, 512 (D.C.1988); and *Wells v. United States,* 515 A.2d 1108, 1111 (D.C.1986). We have stressed, moreover, that "[t]he right to peremptory challenges, although not guaranteed by the Constitution, is regarded as necessary to a fair and impartial trial." *Id.* at 1110 n. 1 (citations omitted); *see Georgia v. McCollum,* 505 U.S. 42, 57, 112 S.Ct. 2348, 2358, 120 L.Ed.2d 33 (1992) (peremptory challenges "are not constitutionally protected fundamental rights; rather they are but one state-created means to the constitutional end of an impartial jury and a fair trial").

So how do we address the question of harmless, nonconstitutional structural error in withholding one of the accused's "most important" rights "regarded as necessary to a fair and impartial trial"? *Wells,* 515 A.2d at 1110 n. 1, 1111. We first must consider exactly what the harm is.

The very idea of a peremptory challenge is the right to strike without regard to cause simply because the defense, for whatever reason (within constitutional limits),[7] does not want that juror on board. The defendant accordingly has a right to use peremptories to achieve his or her own subjective idea of an impartial jury, within the prescribed lim-

---

**4.** Mistaken juror cases, where the error is derived from the pretrial *voir dire* proceeding, do not involve "trial errors" as Justice Rehnquist has described them in *Fulminante,* but they do not really concern "structural errors" either, since the proper *voir dire* structure was in place and nothing could have been done to prevent the errors.

**5.** The majority does not really question the government's obligation to disclose its witnesses to all prospective jurors; it merely says, without citation to authority, that "such an obligation applies equally to the prosecution and to the defense." *Ante* at 1069 n. 12. Perhaps the opinion is referring to my citation to *Anderson,* 626 F.2d at 1374, where the court ruled that if the government was required "to identify each of its witnesses for the jury ... the same should be required of defendants," *i.e.,* the defense should have to identify its own witnesses. Nothing in *Anderson* suggests that the defense is responsible

for calling to the court's attention the government's failure to disclose a government witness. The defense has enough to do in accounting for its own witnesses without being held accountable for policing the government's own voir dire obligations.

**6.** The Court was quoting *Pointer v. United States,* 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894), in which the Court added: "Any systems for impanelling of a jury that prevents or embarrasses the full, unrestricted exercise by the accused of that right [of peremptory strikes], must be condemned." *Id.*

**7.** *See J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (barring peremptory strikes based on gender); *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (barring peremptory strikes based on race).

its. *See supra* note 7. It follows that a finding that a particular juror was not in fact biased—*i.e.*, that there was no objective manifestation of bias—does not meet the objection that the defense had a right to exercise, and would have exercised, a peremptory strike lawfully based on purely subjective perception.

To a significant degree, therefore, a peremptory strike, given its very nature, is intended to prevent subjective harm. The likelihood that "Detective McCoy's testimony had no bearing on appellant's guilt or innocence" because he testified on undisputed, insignificant matters, *ante* at 1072, does not in any respect address the harm felt by a defendant who loses a peremptory strike that would have kept a juror who knew McCoy off the case. The peripheral nature of McCoy's testimony does *not* mean that the juror who personally knew the Detective and spoke with him during trial—however fleetingly and inconsequentially—would *not* be inclined or influenced by that relationship to side with the government, or would not even be perceived to be so influenced. It is the defendant's perception of taint and resulting emotional insecurity—not only hard evidence of actual bias—that reflects one kind of harm a peremptory strike (in the absence of a strike for cause) is intended to remedy. *See Swain*, 380 U.S. at 219, 85 S.Ct. at 835 ("The function of the [peremptory] challenge is not only to eliminate the extremes of partiality on both sides, but *to assure the parties* that the jurors ... will decide on the basis of the evidence before them") (emphasis added). It is, in short, the defendant's perception of an unfair trial that is as harmful—when the purpose of peremptories is accounted for—as the reality of an unfair trial.

I hasten to add, however, that the kind of subjective harm a defendant suffers from the loss of a peremptory strike is not necessarily the kind of harm the law protects. The interest at issue is the defendant's right to an impartial jury, not to one that makes the defendant feel comfortable. Nonetheless, I believe that the Supreme Court and this court have recognized that such impartiality—*i.e.*, objective fairness—can be achieved to the degree of certainty required under our legal system only if we allow the defense as well as the government, within constitutional limits, to pick an impartial jury to some extent through the use of subjective peremptory strikes based partly on intuition. Paradoxically, therefore, the assurance of a truly impartial, *i.e.*, objectively fair, jury depends in part on a subjective assurance—through the limited use of peremptory strikes—that the jury is as impartial as can reasonably be hoped for, using intuitive as well as empirical data. *See Ross*, 487 U.S. at 88, 108 S.Ct. at 2278 (peremptory strikes "are a means to achieve the end of an impartial jury").

To summarize: (1) peremptory strikes are one of the "most important" rights "regarded as necessary to a fair and impartial trial," *Wells*, 515 A.2d at 1110 n. 1, 1111; (2) peremptories, grounded partly in intuition, are considered essential to selection of a truly impartial jury; and (3) the prosecutor's failure in this case to comply with the duty to show all government witnesses to the prospective jurors was an officially-caused breakdown of a basic—a structural—protection inherent in a fair trial. As a result, the harmless error analysis is not easily limited to deciding, as in the mistaken juror cases, whether the juror who would have been stricken was actually biased, *i.e.*, subject to challenge for cause. The *Greenwood/Harris* remedy for loss of opportunity to strike a mistaken juror, which puts the public's interest in finality above the defendant's interest in a peremptory challenge—as long as the juror is found not actually biased—is not necessarily a valid solution when the government itself caused the defendant to lose this valuable protection. A prosecutor's inadvertent failure to carry out an official duty to guarantee an impartial jury is considerably more serious, in my opinion, than the honest failure of a juror to understand and properly answer a lawyer's question. The latter is unavoidable and excusable; the other is not. So what is the remedy?

This court in another context has dealt forthrightly with a case of nonconstitutional, structural error that I believe nicely informs the analysis here. In *Flemming v. United States*, 546 A.2d 1001 (D.C.1988)—a pre-*Fulminante* decision—this court reversed a con-

viction when the defendant's statutory right under D.C.Code § 16–705(c) to a twelve-member jury had been compromised by the trial court's application of a Superior Court rule, inconsistent with the statute, permitting return of the verdict by eleven jurors when the court found "it necessary to excuse a juror for just cause after the jury ha[d] retired." *Flemming*, 546 A.2d at 1003 (quoting Super. Ct.Crim. R. 23(b)).[8] Here was a case in which the defendant was deprived of a most important, though state-created—and thus nonconstitutional—right where we reversed unhesitatingly. I do not believe we would have settled for an analysis that said: eleven jurors are acceptable under the statute when a defendant agrees; eleven jurors can therefore be an impartial factfinder; and the interest of finality trumps Flemming's unwillingness to agree since there is no evidence the jury was a biased or otherwise imperfect factfinder. To the contrary, we unhesitatingly found the nonconstitutional right to a jury of twelve a compelling basis for automatic reversal. As I see it, the right to a peremptory challenge is as fundamental

to jury selection as twelve jurors are to the jury itself.

It follows that state-caused deprivation of such a "most important," structural right cannot be harmless error under the circumstances.[9] It may be that the interests of finality can legitimately sacrifice the loss of a right to peremptory challenge—and thus the loss of a somewhat less demonstrably impartial jury—when honest juror mistake causes a problem that could not have been prevented. *See Greenwood; Harris.* But when the state itself effectively takes away the right, then I believe the defendant is entitled to the truly impartial jury that can be achieved (by definition) only when both parties have full use of their peremptory challenges, with all prospective jurors fully informed about who each government witness will be. In sum, because appellants were entitled to strike the tainted juror, the government's failure, however inadvertently, to show the jury panel Detective McCoy during *voir dire,* coupled with the trial court's error is refusing to declare the requested mistrial, was not harmless.[10]

8. Thereafter, D.C.Code § 16–705(c) was amended to reflect the court rule; the statute now permits the court to receive a verdict from eleven jurors upon a finding of "extraordinary circumstances" making it "necessary" to excuse a sitting juror for "just cause." D.C.Code § 16–705(c) (1996 Supp.).

9. I say "under the circumstances," recognizing that it is very difficult, if not impossible, to discern when, if ever, a nonconstitutional structural error could ever be harmless, rather than *per se* reversible. By definition, all structural errors, whether constitutional errors or not, concern "most important" rights which, if lost, are a substantial loss to the accused. One could probably use *Fulminante* to argue that the only structural errors reflecting really precious rights are constitutional errors, and that any other error best described as structural is simply not "structural." It would follow that any analysis directed at a "nonconstitutional structural error" deals with an oxymoron. Until compelled by higher authority to write otherwise, however, I am satisfied by cases such as *Flemming* and this one that the idea of nonconstitutional structural error has a place in harmless error analysis. If, for example, *Flemming* had been decided after *Fulminante* and someone had argued that the question of reversible error turned on the impartiality of an eleven-member jury rather than on the defective size of the jury, I doubt very much that this court could have been persuaded to affirm.

10. Because of the intuitive component of a peremptory strike that is part of obtaining a truly impartial (objectively fair) jury, I cannot agree with Judge Ruiz's conclusion, *ante* at ——, that this court can "quantitatively assess[ ]" jury impartiality, to the required degree of certainty, when a peremptory strike has been improperly prevented. The party entitled to a peremptory strike has a perspective that makes this intuitive exercise nondelegable and thus not assessable by others, including the court. The question, therefore, is whether the government's action in forestalling the strike is excusable to the point of legal harmlessness when the defendant thereby loses a "most important," structural right to participate as fully as the statute permits in creating and assuring an impartial jury. I believe on the facts of this case the answer is no. When the government, not a "mistaken juror," is responsible for loss of a peremptory strike, I see no basis here for finding harmless a less-than-properly-constituted jury.

Judge Ruiz supplies a *"cf."* citation to D.C.Code § 23–105(d) in support of her argument for harmlessness. *Ante* at 1073. That provision, cited by none of the parties, appears to be inapplicable. Section 23–105 (challenges to jurors) has four paragraphs. The first two, (a) and (b), refer to "peremptory challenges." The third, subsection (c), provides that "[a]ny juror or alternate juror may be challenged for cause." The fourth, subsection (d), also appears to pertain only to challenges for cause:

## II.

This does not end the inquiry, however, for there is a serious question whether Lyons and Cooper preserved the particular "peremptory strike" claim of error presented on appeal. According to the majority, because "[a]ppellants' mistrial motion was based solely on their assertion that the juror was biased"—*i.e.,* that "the juror was or might [have been] 'influenced' by her contact with Detective McCoy"—this court should not construe that motion as a "claim that their right of peremptory challenge was infringed by the continued presence of this particular juror on the jury." *Ante* at 1071. The transcript shows that the defense motion was premised on juror taint—on the "subtle kind of a pressure that she may have felt was being put on her"—and on the defendants' unwillingness "to proceed with eleven jurors." Counsel also lamented the absence of "an alternate [juror] at this point."

Counsel argues on appeal that, implicit in the mistrial motion was an indication that, had the facts been known, trial counsel would have moved to replace the juror with another. We are told that the fact the magic words "peremptory strike" were not used should not make a difference here; the mistrial motion was clearly premised on defense inability to get rid of a juror who trial counsel said should not have been sitting on the jury and whom counsel would have excluded, if the government had disclosed Detective McCoy to the juror during *voir dire.*

There is a problem with this argument. Without any doubt, trial counsel perceived this to be akin to the mistaken juror cases, arguing in effect that there was, in fact, actual juror bias based on a "subtle kind of pressure." Clearly, defense counsel led court and prosecutor to believe the issue was cognizable under the *Greenwood/Harris* rule where the test for a mistrial was a showing of a "valid basis for a challenge for cause."

*Greenwood,* 464 U.S. at 556, 104 S.Ct. at 850. The trial judge invited counsel to make all the points they could think of to enhance the record for appeal, and no one came close to suggesting that a *Greenwood/Harris* analysis was inapplicable when the state itself causes a structural breakdown depriving the defendant of a "most important" right to a peremptory strike. The trial judge, therefore, was not alerted to consider the analysis I find to be a compelling demonstration of harmful error. I agree with the majority: we are into plain error review.

Despite appellant's loss of a "most important," nonconstitutional structural right, the plain error standard is exceptionally difficult to meet, especially without violation of a constitutional right. *See generally Allen v. United States,* 495 A.2d 1145, 1152 (D.C. 1985) (en banc). Unlike the majority, I believe this is a close question. Nonetheless, I cannot say that the error here was plain error "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc) (citations omitted). In the "mistaken juror" cases, according to *Greenwood/Harris,* the loss of a peremptory strike is not reversible error unless the defendant had lost a strike that actually would have warranted dismissal of the juror for cause. I therefore cannot say that the government's inadvertent failure to assure appellants' peremptory strike rights is enough, in the absence of a finding of actual bias, to warrant reversal for plain, in contrast with harmful, error. The government's unintentional culpability in such circumstances is not enough to overcome counsel's failure to alert the trial court to the claim of error first addressed to us, and the "mistaken juror" cases demonstrate that affirmance upon loss of a peremptory strike, without grounds to strike for cause, would not be a miscarriage of justice. Ac-

No verdict shall be set aside for any *cause* which might be alleged as ground for challenge of a juror before the jury is sworn, except when the objection to the juror is that he [or she] has a bias against the defendant such as would have disqualified him [or her], such disqualification was not known to or suspected by the defendant or his [or her] counsel before the juror was sworn, and the basis for such disqualification was the subject of examination or request for examination of the prospective jurors by or on request of the defendant. (Emphasis added.)

In any event, absent the necessary disclosure necessary for a *voir dire* challenge, it is not easy to understand how subsection (d) would apply.

cordingly, while I respectfully dissent from the majority's merits analysis, I must agree there was no plain error. I therefore concur in affirming the judgments of conviction.