Herbert H. GIBSON, Appellant,

v.

UNITED STATES, Appellee.

Russell H. SYKES, Jr., Appellant,

v.

UNITED STATES, Appellee.

Nos. 90–CF–319, 90–CF–489, 93–CO–609.

District of Columbia Court of Appeals.

Reargued Jan. 15, 1997.
Decided Sept. 18, 1997.

Peter H. Meyers, Washington, DC, appointed by the court, for appellant Gibson.

Howard F. Bramson, E. Brunswick, NJ, appointed by the court, for appellant Sykes.

Roy W. McLeese III, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Assistant United States Attorney, were on the supplemental brief, for appellee.

Before FERREN and STEADMAN, Associate Judges, and GALLAGHER, Senior Judge.

## ON PETITION FOR REHEARING

GALLAGHER, Senior Judge:

In light of the full court's decision in *Lyons & Cooper v. United States*, 683 A.2d 1066 (D.C.1996) (en banc), the Hearing Division in this case granted rehearing of this appeal to reexamine the question whether the trial court committed reversible error by denying a request during voir dire for follow-up questioning of prospective jurors. A majority of the original hearing division reversed the convictions of appellants Herbert H. Gibson and Russell H. Sykes, holding that the trial court's erroneous denial of the request frustrated appellants' effective use of their peremptory challenges and was therefore reversible error per se without regard to prejudice as structural error under *Arizona v. Fulminante*, 499 U.S. 279, 309–10, 111 S.Ct. 1246, 1264–65, 113 L.Ed.2d 302 (1991). *Gibson & Sykes v. United States*, 649 A.2d 593, 595 & 596 n. 6 (D.C.1994). In light of the subsequent en banc decision in *Lyons & Cooper, supra,* the reconstituted panel[1] now holds that any error in the trial court's denial of the request for follow-up questioning does not warrant reversal of their convictions because it was harmless in the circumstances of this case. As the original Hearing Division did not have occasion to review appellants' further assignments of error, we consider them here for the first time. Finding them unpersuasive, we affirm the convictions against both appellants.

## I.

After the first trial of appellants and three codefendants ended in a mistrial, a new trial judge retried the case against appellants and two of the original codefendants. During jury selection, the government introduced to the venire the witnesses it intended to call. Seven of these eight government witnesses were police officers. During the trial court's ensuing voir dire examination, fourteen of the prospective jurors responded affirmatively to the question whether they or close relatives had been engaged in law enforcement.

Counsel for one of appellants' codefendants[2] requested follow-up questioning, in particular for one prospective juror who had simply responded that his daughter was "with the Metropolitan Police Department." The trial court denied the request and empaneled the jury, which included three individuals who had indicated connections to law enforcement. Of those three jurors, two had connections with law generally but neither had any actual tie to law enforcement.[3] The individual whose daughter was "with the Metropolitan Police Department" was also seated, but he was designated alternate juror number one.

During the trial, the prosecution learned for the first time that the daughter of this alternate juror worked in precisely the same office of the Metropolitan Police Depart-

---

1. The original panel was composed of Associate Judges Sullivan, Ferren, and Steadman. The reconstituted panel is composed of Associate Judges Ferren and Steadman and Senior Judge Gallagher, who was drawn at random to replace Judge Sullivan, who is now on the United States District Court for the District of Columbia.

2. Since we are affirming on the merits, we shall simply assume, without deciding, that this request by the codefendant was sufficient to preserve the issue for appeal by appellants here.

3. One juror had responded merely that she was a legal secretary, and another had stated only that his father's second wife's brother-in-law was a lawyer.

ment—the Narcotics Task Force in the Morals Division—as the lead prosecution witness who had worked undercover to arrest appellants. When the prosecutor alerted the trial judge to this discovery, defense counsel for appellant Sykes requested the trial court to excuse this alternate juror because it appeared that he had been discussing the case with his daughter. Although the prosecutor dispelled that concern, defense counsel maintained his request to excuse this alternate claiming that he would have struck him for cause during voir dire had the trial court granted the request to ask him follow-up questions about his daughter's role in the police department.

Later in the trial, the trial court nearly replaced a regular juror who was twenty minutes late one morning with this alternate juror. The prosecutor reminded the judge of the mid-trial discovery of this alternate juror's close connection to the government's lead witness and that he had been designated the first alternate. The trial judge agreed to skip over him and sat another alternate juror instead. After the presentation of the evidence but prior to the jury's deliberations, the trial judge excused this alternate juror from further service.

The jury—which therefore did not include the individual whose daughter worked as a police officer with the lead government witness—ultimately found appellant Gibson guilty of conspiracy to distribute cocaine, distribution of cocaine, and possession with intent to distribute marijuana. The jury likewise found appellant Sykes guilty of conspiracy to distribute cocaine. Each of these offenses violated D.C.Code § 33–541(a)(1) (1993).

Appellants Gibson and Sykes challenged their convictions, contending in their consolidated appeal that (1) the trial court abused its discretion by denying the request for follow-up questioning of prospective jurors for the trial during voir dire; (2) the evidence presented was insufficient to support

their conspiracy convictions; and (3) the trial court failed to compel production of all relevant Jencks material. Appellant Gibson further argued that the marriage of his defense counsel to a police officer created a potential or actual conflict of interest.

## II.

In the original appeal of this case, a majority of the Hearing Division held that the trial court's erroneous denial of the request for follow-up questioning was structural error under *Fulminante, supra.*[4] *Gibson, supra,* 649 A.2d at 595 & 596 n. 6. Accordingly, the Hearing Division majority reversed appellants' convictions and remanded their cases for still another trial. *Id.* at 597.

Subsequent to that decision, this court went en banc in a different case to resolve the question whether, in light of the Supreme Court's decision in *Fulminante, supra,* 499 U.S. 279, 111 S.Ct. 1246, trial court interference with the right of peremptory challenge is structural error requiring automatic reversal without a showing of prejudice to the defendant. *Lyons, supra,* 683 A.2d at 1067 & 1069–70. The majority en banc decision there held "that errors adversely affecting the exercise of peremptory challenges are *not* structural errors within the meaning of *Fulminante* and, absent a showing of actual juror bias, do *not* require reversal *per se.*" *Id.* at 1067 (emphasis added).

## III.

On rehearing of this appeal, we acknowledge that there is considerable force in the original Hearing Division's view that when "the government announces its intent to rely almost exclusively on police officer witnesses to attempt to prove its case," the trial court's refusal to "permit at least some minimal further inquiry which could elicit bias in favor of police testimony ... infringed upon appellants' right to exercise either challenges for cause or peremptory challenges." *Gibson, supra,* 649 A.2d at 596. The poten-

---

4. Applying a rule of *per se* reversibility, the original Hearing Division majority held that "the errors at issue here constitute structural errors and involve 'defects in the constitution of the trial mechanism' which affect the entire conduct of

the trial from beginning to end and thus can never be harmless." *Gibson, supra,* 649 A.2d at 595 & 596 n. 6 (citing *Fulminante, supra,* 499 U.S. at 309–10, 111 S.Ct. at 1264–65).

tial inadequacy of the trial court's *pre-trial* examination for bias in favor of law enforcement was clearly brought to light by the surprising *mid-trial* revelation that the daughter of the prospective juror who had informed the court solely that she was "with the Metropolitan Police Department" turned out to work in exactly the same office as the lead prosecution witness. A fuller voir dire examination should have elicited this basic fact and whether that prospective juror was actually biased in favor of his daughter's police officer colleagues as a result. *Boertje v. United States,* 569 A.2d 586, 592 (D.C. 1989) ("Voir dire serves to assure an accused, as far as possible, an impartial jury by exposing any juror biases that might affect the verdict.").

We shall assume trial court error in this regard. Nevertheless, under the circumstances of this case, we conclude that this erroneous voir dire ruling does not constitute an abuse of discretion requiring reversal of appellants' convictions. *See Johnson v. United States,* 398 A.2d 354, 367 (D.C.1979) (explaining that a trial court abuses its discretion only when "the exercise of discretion was in error" and "the impact of that error requires reversal"). The en banc holding in *Lyons* forecloses the original Hearing Division's conclusion that the trial court's denial of the request for further inquiry was structural error requiring *per se* reversal without a showing of prejudice to appellants. 683 A.2d at 1067. Accordingly, we apply harmless error analysis to the trial court's erroneous voir dire ruling and assess whether it harmed appellants. Even applying the most severe test for harmlessness, the constitutional standard of *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), it is plain that in the circumstances here, appellants cannot have suffered any degree of prejudice.

The trial court's refusal to allow follow-up questioning during voir dire did not harm appellants because the ruling did not affect the composition of the jury that convicted them. Only one juror—the father of the police officer who worked in the same office as the government's lead police officer witness—had any connection with law enforcement, but he ultimately served only as an alternate juror and did not participate in any way in the guilty verdicts reached in this case. Fortunately, his superficial involvement in the trial of appellants solely as an excused alternate juror ensures that the trial court's erroneous voir dire ruling was harmless error and not prejudicial. We therefore turn to appellants' remaining contentions.

## IV.

Appellants next contend the evidence presented at their retrial is legally insufficient to establish that they are guilty of conspiring to distribute cocaine. This claim is meritless.

■ To establish the crime of conspiracy, the government must prove three elements beyond a reasonable doubt: (1) an agreement between two or more persons to commit a criminal offense; (2) knowing participation in that agreement with intent to commit the criminal objective; and (3) during the life of the conspiracy, and in furtherance of its objective, the commission by at least one conspirator of at least one of the overt acts specified in the indictment. *Belton v. United States,* 581 A.2d 1205, 1209 (D.C.1990). We will reverse the convictions only if "there is no evidence upon which a reasonable mind could fairly conclude guilt beyond a reasonable doubt, drawing no distinctions between direct and circumstantial evidence." *Harris v. United States,* 668 A.2d 839, 841 (D.C. 1995). Applying these principles to the evidence presented, we reject appellants' claim that the government's proof is legally insufficient to establish that they are guilty of conspiring to distribute cocaine.

■ The record clearly reflects that appellant Gibson and codefendant John C. Harris conspired to distribute cocaine to a police officer working undercover for the Narcotics Task Force in the Morals Division of the Metropolitan Police Department. Responding to reports of drug dealing, Officer Graves pursued an undercover investigation of a shop in the Capital Hilton located at 16th and K Streets in Northwest Washington. On September 27, 1988, Harris sold Officer Graves a $50 bag of powder cocaine in the shop.

Over the course of numerous recorded telephone conversations, Officer Graves arranged for a larger buy. During those phone calls, Harris repeatedly referred to "Hoop," a nickname for appellant Gibson. While "wired" to a surveillance unit, Officer Graves met Harris on October 18, 1988, in the lobby of the Hilton and drove with him to the playground of a school located at Fourth and O Streets, Northwest.

After recognizing his "man's" car and then meeting up with appellant Gibson at the playground, Harris returned to Officer Graves and reported that he could sell him an eighth of "rock" and an eighth of "powder" for $250 a piece. Agreeing to the deal, Officer Graves gave Harris $500 of pre-recorded police funds. A surveillance team then observed appellant Gibson count money received from Harris, get into his taxicab, drive to his house at 1213 34th Street in Southeast Washington, quickly enter and exit, and then drive back to the playground where he met up again with Harris.

Harris and Gibson were both arrested after Harris handed Officer Graves ziplocks containing crack and powder cocaine. A search of appellant Gibson incident to his arrest yielded $1100, including $460 of the pre-recorded money. The remaining $40 of pre-recorded funds was found on Harris. Pursuant to a warrant, a search of Gibson's residence also yielded large quantities of crack cocaine with a street value of over $40,000. There can be no question that this evidence is legally sufficient to establish that appellant Gibson conspired to distribute cocaine.

■ The government presented similarly strong evidence that appellant Sykes was involved in the conspiracy to distribute cocaine. Within an hour of the arrests of appellant Gibson and codefendant Harris, the surveillance team observed appellant Sykes and codefendant Hattie J. Ross enter appellant Gibson's house empty-handed and quickly leave carrying bags. The officers then stopped them while driving away and arrested them in possession of six packets of crack cocaine, eleven sandwich bags of marijuana, cutting cards, a triple-beam scale, a pharmaceutical bowl, and other narcotics distribution paraphernalia. In addition, during the search of appellant Gibson's house, officers recovered $3500 in U.S. Savings Bonds in the name of Russell Sykes as well as a photo pin of appellant Sykes and Ross. This evidence legally suffices to establish that appellant Sykes was also guilty of conspiring to distribute cocaine.

We turn next to the Jencks issue. To facilitate the impeachment of a government witness, and to regulate defense access to witness statements and reports, the Jencks Act requires the government upon request to provide the defense with all relevant witness statements in its possession following the direct testimony of the witness. 18 U.S.C. § 3500(b) (1988); see March v. United States, 362 A.2d 691, 698 (D.C.1976) (citing Palermo v. United States, 360 U.S. 343, 352–53, 79 S.Ct. 1217, 1224–25, 3 L.Ed.2d 1287 (1959)).

The government complied with its duty to provide all Jencks materials. Appellant Sykes was concerned in particular, at the close of the testimony by Officer Graves, that the government allegedly failed to produce so-called buy reports (of narcotics) prepared by Officer Graves. The record discloses, however, that counsel for appellants Sykes and Gibson both had copies of buy reports because they were produced at the first trial. Moreover, despite its initial reluctance, the trial court eventually ordered the government to reproduce the reports at the retrial.[5]

■ Appellant Gibson makes the final contention that his trial counsel's marriage to a police sergeant created a potential or actual conflict of interest. He argues in particular that the failure of his lawyer to disclose her husband's identity and further advise him of his right to seek new counsel requires rever-

5. The related argument that appellant Sykes was denied a full opportunity to cross-examine Officer Graves with the Jencks material is similarly unavailing. The record indicates that counsel for Sykes asked questions about the buy reports

sal of his convictions.[6]  We disagree.

Counsel's husband was present in the courtroom during her cross-examination of various police officer witnesses and knew Officer Graves, the key government witness. Appellant Gibson concedes, however, that his counsel introduced her husband to him and informed him he was a police officer.  After conviction, and after appointment of new counsel, Gibson filed a motion for post-conviction relief under D.C.Code § 23–110. During the hearing on the motion, Gibson's newly appointed counsel further conceded that "[w]e do not complain that [trial counsel's] cross-examination was inadequate, or that her investigation was inadequate or in any way her trial performance was inadequate."  Nevertheless, Gibson now argues on appeal that his trial counsel's ineffective performance at trial did have an adverse effect on him.

 We agree with the trial court[7] that appellant Gibson's Sixth Amendment right to effective assistance of counsel was not infringed. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  In the context of an alleged conflict of interest, however, Gibson need not demonstrate ineffective assistance of counsel. Rather, he need only make the more modest showing "that counsel's representation was adversely affected by an actual conflict of interest" *(Jermaine C.) Thomas v. United States,* 685 A.2d 745, 751 (D.C.1996).  We conclude that appellant Gibson has failed to demonstrate the existence of an actual conflict or any adversity resulting from his trial counsel's marriage to the police sergeant.

## V.

We hold there was no error requiring reversal and, accordingly, we affirm the judg-

ments of conviction against appellants Gibson and Sykes.

*So ordered.*

---

and that Officer Graves explained what they were and how he prepared them.

6.  Appellate counsel claims that "[s]o far as Mr. Gibson was concerned, the police were all over his case; the prosecution, the jury, and his own lawyer."

7.  We naturally disavow, however, the trial court's most unfortunate comment that trial counsel's "very professional job" was "far better than the defendants really deserved."