Gilbert DORET, Appellant,

v.

UNITED STATES, Appellee.

No. 97–CF–972.

District of Columbia Court of Appeals.

Argued Oct. 26, 1999.

Decided Dec. 28, 2000.

Richard K. Gilbert, appointed by the court, Washington, DC, for appellant.

Sarah T. Chasson, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Mary–Patrice Brown, and Martin Dee Carpenter, Assistant United States Attorneys, were on the brief, for appellee.

Before REID and GLICKMAN, Associate Judges, and FERREN, Senior Judge.

REID, Associate Judge:

After a 1997 jury trial, appellant Gilbert Doret, also known as Anthony Wayne Grant, was convicted of conspiracy to distribute cocaine between July 1, 1990 and July 13, 1990, in violation of D.C.Code §§ 22–105(a) (1996), and 33–541(a)(1) (1998); first-degree murder (premeditated) while armed of Marcus Lee, in violation of §§ 22–2401, –3202; possession of a firearm during the commission of a crime of violence ("PFCV") (the murder of Lee), in violation of § 22–3204(b); possession

with intent to distribute cocaine ("PWID"), on July 13, 1990, in violation of § 33–541(a)(1); and unlawful possession of ammunition, in violation of D.C.Code § 6–2361(3) (1995).[1] He challenges his convictions mainly on the grounds that the trial judge: (1) "improperly impaired [his] right to exercise peremptory challenges when he precluded any follow-up questioning of jurors who indicated that they, their family, or close friends had ties to law enforcement"; and (2) committed reversible error in admitting into evidence statements, through the testimony of a police sergeant, as *declarations against the penal interest* of a deceased associate, Derrick Feaster, which provided a motive for the murder of Lee. First, we conclude that the trial judge erred by precluding defense counsel from directing follow-up law enforcement questions to seven jurors, since the testimony of police officers and government experts played a substantial role in the case against Doret; but that the error was harmless. In addition, we hold that where potential jurors remain silent during the *voir dire* examination, in response to a general question regarding their ability to be fair and impartial jurors despite their family or close relationships with persons in the law enforcement field, the trial court has an obligation to probe further, and to elicit more than a nod of the head or a simple "yes" or "no" response, to ensure their impartiality and fairness as jurors. Second, we conclude that the trial court erred in admitting statements attributed to Feaster as declarations against his penal interest; and that the error was not harmless. Therefore, we reverse the convictions of Doret for first-degree murder (premeditated) while armed and PFCV, and order a new trial on those charges. However, we sustain Doret's convictions

for conspiracy to distribute cocaine; possession with intent to distribute cocaine; and unlawful possession of ammunition.

## FACTUAL SUMMARY

The government's evidence presented at trial showed that Marcus Lee was killed on July 11, 1990, around 3:00 a.m. while he was speaking with his mother, who lived in California, from a pay telephone at Brown and Newton Streets, N.W. in the District of Columbia. As he talked with his mother, Lee described an approaching black rental car and, in a frightened voice, said: "[I]t's Gil,[2] Ma, it's Gil, Ma." These words were followed by a "loud penetrating noise," and then the "clok, clok, clok of the phone beating back and forth." On cross-examination Lee's mother was asked about two prior statements during which she said she was not certain she heard a gunshot. In addition to Lee's mother, two persons who lived in the Brown/Newton Street area testified. One had walked near the pay phone around 2:30 or 3:00 a.m. on July 11, 1990, and saw a man walking toward the pay telephones, as well as a car slowly moving .down Newton Street as one of the passengers looked toward the person approaching the pay phones. Another neighbor heard a noise that resembled gunfire around 3:00 a.m. the same morning, ran to the window, and saw a dark sedan "zooming up Brown Street," and a body near the pay phones. He called 911.

As a motive for Doret's alleged shooting of Lee, the government presented testimony at trial, primarily from one Metropolitan Police Department ("MPD") police officer, Sergeant ("Sgt.") Daniel Wagner, who had questioned Feaster,[3] another member

1. Doret was sentenced to consecutive terms (except for the ammunition sentence which was to be served concurrently): (1) twenty months to sixty months for conspiracy; (2) twenty years to life on the murder charge; (3) five to fifteen years for PFCV; (4) eight to twenty-four years for PWID; and (5) one year for possession of ammunition.

2. Throughout the trial transcript, "Gil" is also spelled as "Gill."

3. Feaster was killed prior to Doret's trial. Nothing in the record before us indicates a connection between Doret's trial and Feaster's death.

of the drug operation.[4] Feaster had recounted an argument between Lee and Doret in which Lee maintained that Doret owed him money. As payment to himself, Lee retained approximately fourteen hundred dollars from drug sales that would have gone to Doret. When police officers went to the apartment that served as the alleged crack or stash house for the drug operation, they found latent fingerprints, one of which matched those of Doret. In addition, they discovered ammunition, ziplock bags containing traces of a substance that tested positive for cocaine, a triple beam scale, and a safe containing four brown envelopes. The jury heard testimony from other members of the drug operation, specifically Eugene Frazier and Darren Hargrove, who described its structure and activities, including the use of the crack house, and from three female witnesses who were friends of Lee, one of whom had visited the crack house with Lee. Frazier and Hargrove stated that they routinely "sold drugs together" with Doret, and that he was the "leader" of the group. Moreover, the crack house apartment had been rented in 1990 by Doret's girlfriend, Anita Fortune, who later became his wife.

## ANALYSIS

### The Voir Dire Issue

We begin with the factual background for Doret's argument regarding the impairment of his right to exercise peremptory challenges. Approximately five months prior to trial, counsel for Doret submitted "requested voir dire questions and procedures" and a memorandum of points and authorities in support of his request. He asked for an opportunity to pose follow-up questions to potential jurors "[i]n order to more accurately detect bias and to allow counsel to meaningfully exercise his peremptory challenges." Among the follow-up questions counsel included in his request were those designed for jurors, their family members or close friends, having "a connection to law enforcement or the criminal justice system." Specifically, counsel proposed to ask:

(a) If the individual is a close friend, how long the juror has known the individual and what is the nature of the relationship?

(b) What relevant organizations the individual works or has worked for?

(c) How many years has or did the individual spend with each organization?

(d) What was the individual's job with each organization and whether those duties directly involved the apprehension of criminals?

(e) To what extent did or does the individual discuss his work with the juror?

(f) Whether the juror has a particular concern for the individual which could be affected by a decision to convict or acquit the defendant?

(g) Whether the fact of the individual's employment would cause the juror to be swayed for or against either side?

Instead of the specific questions requested by Doret, the trial judge posed the following question to the jury panel:

Ladies and gentlemen, let me ask whether or not any of you, any members of your immediate family, or very close personal friends, are employed by law enforcement agencies or by any defense attorneys or as defense investigators. Any of you or members of your family employed by law enforcement agencies, by any defense attorneys or defense investigators. I would include within the ambit of law enforcement even security guards. Anyone who would have arrest powers; and I would include also prosecutor officers of any sort.

Seventeen potential jurors responded to the inquiry, five of whom were excluded

---

4. Sgt. Roger Hearron gave testimony at a pretrial hearing concerning Doret's motion to exclude testimony regarding Feaster's declarations. However, he did not present testimony at trial on this issue.

for cause; an additional four were not reached during the selection process; and the government used one of its peremptory strikes against yet another. Doret focuses on the remaining seven jurors in crafting his argument.

The seven remaining jurors were numbers 876, a Drug Enforcement Agency employee; 920, a District police officer whose husband and brother also were police officers; 076, whose closest friend and business partner was a former District police officer; 121, whose business partners were defense attorneys; 772, a Secret Service employee with several federal agents as close friends; 817, who worked with Secret Service agents and whose cousin was an FBI agent; and 824, a research manager for a health care organization who stated: "I have two close friends of mine that work for the Department of Justice and the Parole Commission."

After the seventeen persons responded affirmatively to the general law enforcement question, the trial court asked:

> Ladies and gentlemen, just because of the occupation of those individuals, do you think that would have any impact upon your ability to listen to the evidence in this case and be fair to both sides just because you know someone who may have some law enforcement background?

When none of the potential jurors replied, the trial judge said: "I take it from your silence that the answer is no." The record reflects no audible response from the jurors. As a "follow-up" or "precursor" question to the entire jury panel, the judge inquired, in part, "whether or not because of any publicity, general publicity about Washington, D.C. or general publicity about the crime problem in Washington, D.C. . . . any of you feel you could not listen to the evidence in this case and judge the guilt or innocence of the defendant based upon the evidence." None of the jurors answered affirmatively. The trial judge raised a few additional questions, including potential jurors' personal feel-

ings about firearms, firearm-related offenses, and drug crimes; and whether the potential jurors or family members or their close personal friends had been a victim of or witness to a homicide, weapons, or assaultive offense.

When the trial court had concluded most of its questions to the jury panel, defense counsel reminded the court that he had submitted requested *voir dire* questions and asked for the opportunity to pose follow-up questions to jurors who had close friends or family members in the law enforcement field, so that he "might intelligently exercise [his] peremptory challenges." The trial judge replied: "I think I have adequately covered the area and I think I will not allow any other followup [except in two other areas, the occupation of each juror; and in the event a juror knew another juror, the nature of the relationship]." Therefore, counsel for Doret was not permitted to make further inquiry of the seventeen jurors who responded affirmatively to the law enforcement inquiry.

When it came time to exercise peremptory challenges, counsel for Doret used his ten as follows: one (his second) on a juror (number 112) who apparently manifested "non-verbal clues" of bias; six to strike six of seventeen jurors who responded affirmatively to the law enforcement question; two to eliminate two attorneys who asserted that they would experience hardship if selected for service; and one on a juror whose brother was killed in the same year as the decedent in Doret's case. Juror No. 824, one of the seventeen who replied affirmatively to the law enforcement question, was not struck.

Doret contends that the trial judge "improperly impaired [his] right to exercise peremptory challenges when he precluded any follow-up questioning of jurors who indicated that they, their family, or close friends had ties to law enforcement." The government argues that the trial court did not abuse its discretion by declining to ask

follow-up questions regarding the law enforcement inquiry, and maintains that there was no substantial prejudice to Doret because the court posed other questions designed to weed out bias. In addition, the government contends that Doret could have used a peremptory challenge to strike Juror No. 824 instead of the juror who was struck on the ground of "non-verbal clues" of bias.

The Sixth Amendment to the Constitution of the United States specifies that: "In all criminal prosecutions, the accused shall enjoy the right to a ... public trial, by an impartial jury...." The process of obtaining an impartial jury, in part by disqualifying biased jurors, unfolds during the fundamentally important *voir dire* examination of potential jurors, conducted by the trial judge. Thus, "the impaneling of a fair and impartial jury is 'the task of the trial judge.' " *Dingle v. State,* 361 Md. 1, 759 A.2d 819, 825 (2000) (quoting *Boyd v. State,* 341 Md. 431, 671 A.2d 33, 35 (1996)). In that regard, "the trial court [has] broad discretion in conducting *voir dire* examination; absent an abuse of discretion and substantial prejudice to the accused, the trial court will be upheld." *Murray v. United States,* 532 A.2d 120, 122 (D.C.1987) (citations omitted).

The empaneling of a fair and impartial jury depends in large measure on how the *voir dire* examination is conducted. A potential juror's bias may be obvious when he or she admits actual bias; or implied or presumed as a matter of law, as in the case of a potential juror who is related to a party in the case; or inferred "when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant [such as a relationship with a prosecutor] to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias." *United States v. Torres,* 128 F.3d 38, 47 (2d Cir.1997). "[T]he court is allowed to dismiss a juror on the ground of inferable bias only after having received responses from the juror

that permit an inference that the juror in question would not be able to decide the matter objectively. In other words, the judge's determination must be grounded in facts developed at *voir dire.*" *Id.* at 47. If, after proper questioning of a potential juror for bias, the trial judge, in his or her discretion, decides that there is an insufficient basis to disqualify that juror for cause, counsel for one of the parties still has an opportunity to strike that juror by using a peremptory challenge.

We reiterated the significance of peremptory challenges in *Lyons v. United States,* 683 A.2d 1066 (1996) (en banc):

> More than a century ago, the Supreme Court said that the right to strike jurors without cause is "one of the most important of the rights secured to the accused.... Any system for the empanelling of a jury that prevents or embarrasses the full, unrestricted exercise by the accused of that right, must be condemned."

*Id.* at 1070 (quoting *Pointer v. United States,* 151 U.S. 396, 408, 14 S.Ct. 410, 38 L.Ed. 208 (1894)). Nonetheless, the relationship between the exercise of peremptory challenges and a fair and impartial trial is not a direct one. As the Supreme Court of the United States declared in *United States v. Martinez–Salazar,* 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000):

> The peremptory challenge is part of our common-law heritage. Its use in felony trials was already venerable in Blackstone's time. *See* 4 W. BLACKSTONE, COMMENTARIES 346–348 (1769). We have long recognized the role of the peremptory challenge in reinforcing a defendant's right to trial by an impartial jury.... But we have long recognized, as well, that such challenges are auxiliary; unlike the right to an impartial jury guaranteed by the Sixth Amendment, peremptory challenges are not of federal constitutional dimension. *Ross v. Oklahoma,* 487 U.S. 81, 88 [108 S.Ct. 2273, 101 L.Ed.2d 80] (1988); *see Stilson v.*

*United States,* 250 U.S. 583, 586 [40 S.Ct. 28, 63 L.Ed. 1154] (1919) ("There is nothing in the Constitution of the United States which requires the Congress to grant peremptory challenges.")

*Id.* at 779. Earlier, in *Rosales–Lopez v. United States,* 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981), the Supreme Court described the link between the *voir dire* and peremptory challenges:

> *Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. *See Connors v. United States,* 158 U.S. 408, 413 [15 S.Ct. 951, 39 L.Ed. 1033] (1895). Similarly, lack of adequate *voir dire* impairs the defendant's right to exercise peremptory challenges where provided by statute or rule, as it is in the federal courts.

*Id.* at 188 (footnote omitted); *see also Jenkins v. United States,* 541 A.2d 1269, 1272 (D.C.1988); *Cordero v. United States,* 456 A.2d 837, 841 (D.C.1983).

In Doret's case, two inquiries are essential with respect to potential juror bias and the exercise of peremptory challenges. First, did the trial court ask, or permit the parties to pose, sufficient questions to determine whether seven jurors should have been struck for cause because bias was inferable due to their employment in the law enforcement field, or such work by relatives or close friends? Second, was Doret's right to exercise peremptory challenges prejudiced by the trial judge's failure to permit follow-up questioning of the seven jurors? In searching for answers to these two inquiries, we recognize that Doret's *voir dire* experience bears some resemblance to two of our past cases, *Murray, supra,* and *Gibson v. United States,* 700 A.2d 776, 777 (D.C.1997).

In *Murray, supra,* we considered "whether the defendant had enough information to make effective use of her peremptory challenges or, instead, her ability to do so was impaired by the court's denial of her request to ask follow-up questions of additional members of the jury venire." *Id.* at 123. We recognized there "that defendants must ... 'be permitted sufficient inquiry into the background and attitudes of the jurors to enable them to exercise intelligently their peremptory challenges.'" *Id.* (quoting *United States v. Dellinger,* 472 F.2d 340, 368 (7th Cir. 1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973)). We affirmed the conviction in *Murray, supra,* in part, because we concluded that "the *voir dire* of the two jurors in question ... was at least minimally sufficient and within the range of the trial court's discretion" even though "it would have been the better practice for the court ... to delve further into the juror's relationship with [a prosecutor] ... and any effect it had on him...." *Id.* at 123–24. Notably, the trial court's follow-up questioning of the two jurors in *Murray, supra,* was tailored to their responses to the law enforcement question. For example, a juror whose sister was a District police officer was asked:

> Is there anything about her work, maybe some story that she has told you of one of her experiences? Maybe she's been injured or maybe she has shared a view with you that has made a strong impression upon you that causes you to believe that you might be biased or prejudice[d] against either side in this case?

*Id.* at 121. While the trial court did not permit counsel for the defendant to ask additional questions of four other jurors, it informed counsel that he could pick two of the four for further questioning.

*Gibson, supra,* presented the issue as to "whether the trial court committed reversible error by denying a request during voir dire for follow-up questioning of prospective jurors" when one juror stated that his daughter was employed by the Metropoli-

tan Police Department, and "the government announce[d] its intent to rely almost exclusively on police officer witnesses to attempt to prove its case...." *Id.* at 778. We assumed error but concluded, after our decision in *Lyons, supra,* that reversal of the conviction was not required because the appellant suffered no prejudice. *Id.* at 779.[5] We said: "The trial court's refusal to allow follow-up questioning during voir dire did not harm appellants because the ruling did not affect the composition of the jury that convicted them." *Id.* Unlike Doret's case, the juror in question in *Gibson, supra,* served only as an alternate and did not participate in jury deliberations. Consequently, we concluded that the juror's "superficial involvement in the trial of appellants solely as an excused alternate juror ensures that the trial court's erroneous voir dire ruling was harmless error and not prejudicial." *Id.*

In this case, the trial court refused defense counsel's request to ask follow-up questions of jurors who were or had immediate family members "or very close personal friends" who were "employed by law enforcement agencies, or by defense attorneys or as defense investigators." When seventeen prospective jurors responded affirmatively to the question, the trial court asked, simply, whether "the occupation of those individuals ... would have any impact upon your ability to listen to the evidence in this case and be fair to both sides...." There was only silence in re-

sponse to the court's follow-up question, and the court assumed, without determining, that silence meant a negative response. Furthermore, the court refused to allow follow-up questions, saying: "I think I have adequately covered the area." The trial court's approach invokes our prohibition on "asking a single conclusory question regarding a juror's prejudice." *Murray, supra,* 532 A.2d at 123 (referencing *Dellinger, supra,* 472 F.2d at 369).

Given the importance of the *voir dire* to impartiality, silence of the jurors, or even a simple "yes" or "no" response, in the face of the court's question as to how the occupation of law enforcement family or close friends might impact on their role as jurors, cannot be regarded as reassuring. Failure of the trial judge to pose the follow-up inquiries requested by the defense left unanswered several critical questions with respect to Juror No. 824 and the others: (a) how long they had known the persons identified as in the law enforcement field; (b) how long the persons had been in law enforcement; (c) the nature of the persons' jobs in law enforcement; and (d) the extent to which the prospective juror had discussed with the persons his or her law enforcement work. The government points to other questions posed by the trial judge which were designed to weed out bias. None of these questions, however, explored the relationship between the identified law enforcement person and the prospective juror.[6] Although

---

5. Prior to *Lyons, supra,* the panel majority in *Gibson* had reversed the convictions of the appellants on the ground that denial of defense counsel's request to ask follow-up questions of the jury panel frustrated the defendant's use of his peremptory challenges. *Gibson & Sykes v. United States,* 649 A.2d 593, 595 (D.C.1994).

6. The questions singled out by the government include: (1) "Do any of you have such religious or philosophical beliefs you could not sit in judgment and be a factfinder in a case?" (2) "[D]o any of you have such strong personal feelings about the use and possession of firearms, about the enforcement of our drug laws or our firearm laws that you think you could not sit here and judge the guilt or

innocence of the defendant based only on the evidence you hear in the courtroom[?]" (3) "[Would] any of you automatically believe or automatically reject or give greater or lesser credence to the testimony of a witness merely because that witness happened to be a police officer[?]" (4) "[H]ave any of you or any members of your immediate family or very close personal friends within the last ten years ever been a victim of, a witness to or charged with a homicide offense or any other assaultive offense that involves a firearm, a weapon of any kind, or any drug-related offense[?]" (5) "[B]ecause of any publicity, general publicity about Washington, D.C. or general publicity about the crime problem in Washington, D.C. [do] any of you feel you

we require no particular script of questions, the follow-up inquiry must be adequate to develop the nature and extent of the relationship.

■ We fully appreciate the fact that our trial judges often operate under enormous pressures to cope with very substantial caseloads, frequently finding themselves on "circuit overload," and thus, pressed to move trials along. Nonetheless, the guarantees of the Sixth Amendment require assurances that jurors empaneled, under the watch of the trial judge, are without biases or prejudices that can foil a fair trial. On the record in this case, we conclude that the trial court erred by precluding defense counsel from directing follow-up law enforcement employment questions to the seven jurors at issue in this case, since the testimony of police officers and government experts was scheduled to be presented against Doret. *See Dingle, supra,* 759 A.2d at 826 ("[V]oir dire, whether in a capital case or in the more usual situation, to be meaningful, must uncover more than 'the jurors' bottom line conclusions [to broad questions], which do not in themselves reveal automatically disqualifying biases as to their ability fairly and accurately to decide the case, and indeed, which do not elucidate the bases for those conclusions ....") (citing *Bowie v. State,* 324 Md. 1, 595 A.2d 448, 459 (1991)). Consequently, we hold that where potential jurors remain silent during the *voir dire* examination, in response to a general question regarding their ability to be fair and impartial jurors despite their family or close relationships with persons in the law enforcement field, the trial judge has an obligation to probe further, and to elicit more than a nod of the head or a simple "yes" or "no" response, to ensure their impartiality and fairness as jurors.

■ We turn now to the issue of reversible error. After *Lyons, supra,* it is

could not listen to the evidence in this case and judge the guilt or innocence of the defendant based upon the evidence[?]" (6) "Is

clear that we apply a harmless error standard to cases challenging the *voir dire* due to the refusal of the trial court to permit follow-up questions designed to weed out juror bias. As we said in *Sams v. United States,* 721 A.2d 945, 951 (D.C.1998):

In the years since [*Arizona v.*] *Fulminante* [, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) ], the Supreme Court has not ruled on the standard of review applicable to an error affecting the right of peremptory challenge when the defendant preserved his objection in the trial court. We recognize that several federal circuits have adhered to the view that the erroneous denial or impairment of the right of peremptory challenge is reversible *per se* even after *Fulminante.* *See United States v. Annigoni,* 96 F.3d 1132 (9th Cir.1996) (en banc) (holding that errors respecting peremptory challenges are "structural" and thus not amenable to harmless error review); *Kirk v. Raymark Industries, Inc.,* 61 F.3d 147 (3d Cir.1995) (denial or impairment of a statutory right challenge is *per se* reversible error without a showing of prejudice), *cert. denied,* 516 U.S. 1145, 116 S.Ct. 1015, 134 L.Ed.2d 95[ ] (1996); *United States v. Broussard,* 987 F.2d 215 (5th Cir.1993) (denial of the right of peremptory challenge is reversible error without a showing of prejudice), *superseded on other grounds by J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89[ ] (1994). Nevertheless, we are bound by, and adhere to our contrary holding in *Lyons.* Consistently with *Lyons,* we hold that because the denial or impairment of the peremptory challenge right is a "trial error" within the meaning of *Fulminante,* but not a "structural error," it is subject to harmless error review when it has been properly preserved.

there any reason at all that you think you may not be fair in this case?"

*Id.* at 951 (footnotes omitted).[7] Furthermore, we said: "*Lyons* makes clear that even if there is a violation of a defendant's right of peremptory challenge, reversal is not required absent a showing of actual juror bias." *Id.* at 952.

What is not as clear from *Lyons, supra,* is whether we apply the constitutional standard set forth in *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), or the non-constitutional standard in *Kotteakos v. United States,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *See Gibson, supra,* 700 A.2d at 779; *Sams,* 721 A.2d at 952 n. 12. In *Gibson, supra,* we stated: "[W]e apply harmless error analysis to the trial court's erroneous voir dire ruling and assess whether it harmed appellants." *Id.* at 779. In addition, we said in a footnote in *Sams* that: "Under *Gibson,* the test of harmlessness remains whether the error affected the verdict—not ... whether it affected 'the composition of the jury.'" 721 A.2d at 952 n. 12. This test is difficult to meet. *Id.* at 952. Of course, if the potential juror in question is not seated as a member of the jury, "it is plain that ... [the] appellant[ ] cannot have suffered any degree of prejudice." *Gibson, supra,* 700 A.2d at 779. In this case, however, Juror No. 824 became a member of Doret's jury, and deliberated as to his guilt or innocence. Therefore, we must ask, assuming Juror No. 824's bias in favor of law enforcement officers, whether the government has shown that this law enforcement bias did not affect the jury deliberations in light of the evidence presented.

When a case depends primarily on testimony from law enforcement officers, we examine "the degree of impact which the testimony in question would be likely to have had on the jury and what part such testimony played in the case as a whole."

*Jenkins v. United States,* 541 A.2d 1269, 1275 (D.C.1988) (quoting *Brown v. United States,* 119 U.S.App.D.C. 203, 205, 338 F.2d 543, 545 (1964)). The case against Doret depended heavily on the testimony of civilian witnesses, rather than that of law enforcement officers. With respect to the drug conspiracy, and drug possession with intent to distribute charges,[8] the testimony of others, in particular that of Eugene Frazier and Darren Hargrove, who participated in the drug operation with Doret and Lee, was pivotal. They stated that they routinely "sold drugs together" with Doret, and that he was the "leader" of the group. They described the use of the crack house on Center Street for the drug operation, and testified that Doret would place "the money or the [drugs] kept at the end of the day ... in the safe" in the crack house. Although Doret did not concede that he was guilty of conspiracy, he stated in his main brief that: "The government had a great deal of evidence to support the conspiracy count." Thus, Doret's case is unlike that of *Gibson, supra,* where the government's case rested "almost exclusively on police witnesses...." *Id.* at 778. In summary, on the record before us, we are satisfied that, even assuming Juror No. 824 was biased in favor of law enforcement officers, that bias would not have affected jury deliberations and the verdict in light of the nature of the evidence presented. *See Gibson, Jenkins, supra.*

### The Declaration Against Penal Interest Issue

We begin with the factual background for the issue concerning the admission into evidence, as declarations against Feaster's penal interest, of certain statements attributed to him. The evidentiary issue pertaining to the statements stems primarily from the testimony of Sgt. Wagner of the

---

7. The Ninth Circuit also adheres to the principle that: "The presence of a biased juror cannot be harmless; the error requires a new trial without a showing of prejudice." *Dyer v. Calderon,* 151 F.3d 970, 973 n. 2 (9th Cir. 1998).

8. Given our disposition as to the declaration against penal interest issue, we need not assess the evidence relating to the first-degree murder (premeditated) and the related PFCV and ammunition convictions.

MPD, both at a pre-trial hearing on Doret's motion to exclude statements made by Feaster, and at trial. At the pre-trial hearing, Sgt. Wagner testified that, two days after the murder of Lee, he went to the 1400 block of V Street, N.W., with two other detectives, in response to a call from someone, indicating that Sgt. Wagner "should come [to the V Street address] and talk to [Feaster and Etho[9]] about what happened to Marcus [Lee]." In a hallway at the V Street address, after Etho left, Sgt. Wagner asked Feaster, "What is this all about and what happened?" Feaster "began to relate information to [Sgt. Wagner] relative to a homicide that had happened a couple days previous to that of a friend of his, Marcus [Lee]." Feaster maintained that: "He was one of the runners who actually did street sales just like . . . what [Lee] was, and that they got their drugs from Gill and sold them to regular customers." The drug activity was conducted out of an apartment located in the 3300 block of Center Street, N.W. The three detectives "escorted" Feaster from the V Street address to Center Street, where Feaster continued to recount events to the sergeant:

> He told me some information about an argument that had occurred just prior to the shooting, and that the person that he suspected of doing the shooting, his name was Gill. He described Gill to me. He described the argument. I described part of the argument where Gill had retrieved a gun from a safe within a stash house apartment up on Center Street and showed me into the apartment[,] myself and a couple of other detectives[,] and he showed me where the safe was.[10]

Sgt. Wagner indicated that Feaster had entered the Center Street apartment with a key; that the apartment was "very sparsely furnished" and contained drug paraphernalia, a safe, and ammunition.

The apartment was used "to cut up and store the drugs, and they would come and go from the apartment as they would run out of drugs and get some more and go back out on the street with them." Feaster said, "He and [Lee] . . . actually did the selling [of drugs] on the street to the users." In recounting what Feaster had told him about the argument between Doret and Lee, during which Feaster sided with Lee, Sgt. Wagner stated:

> He talked about the argument being over—the decedent [Lee] had sold a bunch of crack on the street, earned something around fifteen hundred dollars, and instead of turning that money over to his boss, which was Gill, who was running the operation, he went and bought some jewelry with it instead.

> And he claimed that the decedent was owed the money because Gill had never paid him for any of the drug dealing that he had done, and he said, "Well, I am just keeping it myself and doing with it what I want." That caused the argument.

When asked on cross examination whether the jewelry was mentioned during the argument, Sgt. Wagner said he was not "sure" that it was, but he was certain that:

> Gill didn't get his money and he wanted his money, and the bone of contention was he had—that Marcus [Lee] had not been paid by Gill for doing all of this drug selling, and he deserved to keep the money. That was Marcus' point and that was—[Feaster] subscribed to that view of the argument, to Marcus' view.

The trial judge intervened during cross-examination in an attempt to determine which of the statements attributed to Feaster could be admitted into evidence. He inquired as to whether Sgt. Wagner was "sure" that Lee "thought he deserved

---

**9.** "Etho" or "Ito" apparently is the nickname of Anthony Brown, one of the associates in the drug operation, who did not testify at Doret's trial.

**10.** Feaster's description of "Gill" matched that of Gilbert Doret.

to keep the money because he had not been paid?" Sgt. Wagner replied, "Yes." When asked about the specific words that Feaster had uttered to Gill, Sgt. Wagner stated: "Yes, you have not ever paid him, so he don't owe you anything." On redirect examination, Sgt. Wagner was asked: "Do you remember what statements were attributable to defendant Gill?" The sergeant answered: "He wanted his money."

Sgt. Roger Hearron of the MPD also testified at the pre-trial hearing. He took a statement from Feaster on July 19, 1990, at the United States Attorney's office. Part of the statement gave an account of the alleged argument involving Lee, Doret and Feaster. According to Sgt. Hearron, Lee stated "that Gill [Doret] owed him fifteen hundred dollars. Gill was not paying him the money, so Marcus [Lee] took the fifteen hundred that he had made and went out and purchased a chain, a piece of jewelry.... [Doret said] that he wanted the money, he wanted the fifteen hundred dollars." When asked, "What was Mr. Feaster saying," Sgt. Hearron responded: "I don't believe Mr. Feaster was involved in that part of the argument. He was there listening to what Gil [Doret] and Marcus [Lee] were talking about." Feaster said he saw Lee with a gun. On cross-examination, Doret's counsel established that Feaster was not a suspect in Lee's murder.

At the conclusion of the pre-trial hearing testimony, the trial judge concluded, in part:

> Fe[a]ster certainly made sufficient inculpatory admissions with respect to his own conduct as a drug runner and dealer for those admissions to come in under L[a]um[e]r [11] ... and I will make the appropriate findings in the three-step analysis that the statement[s] w[ere] made[,] that there are corroborating circumstances[,] and they are sufficiently reliable and trustworthy in terms of his own personal involvement in the drug conspiracy.

The three Feaster statements that the trial court ruled admissible as declarations against penal interest were: (1) Lee told Doret, "He thought he deserved to keep the money because he had not been paid"; (2) Feaster said to Doret, "Yes, you have not ever paid him. So, he don't owe you anything"; and (3) Doret informed Lee that, "He wanted his money." The trial judge ruled that because Feaster "detail[ed] his role in the drug operation, where the stash house was, where he sold drugs, who he was working with ... [,] he made sufficient inculpatory admissions for the court easily to conclude that it's sufficiently against his penal interest to be admitted under La[u]mer," supra. Furthermore, the trial judge found that Feaster made the statements attributed to him through police testimony, and that Feaster was unavailable to testify because of his death. As to whether the statement of Feaster's involvement in the drug operation was trustworthy, the trial judge stated:

> In light of the police investigation which corroborates so much of what he said, the fact that apparently there's a fingerprint from inside the safe, the fact that there are other witnesses who will describe this drug operation[,] ... I think there are sufficient corroborating circumstances that this would be admissible, ... that is Feaster's own statements, as a declaration against his own penal interest, and the statement[s] could come in to show his knowing membership in the conspiracy.

With respect to statements that Feaster attributed to Lee and Doret, the trial judge determined that:

> [T]hese statements are admissible against Feaster to prove his own membership in the conspiracy and because they are declarations against his own penal ... interest, and probably admissible ... to prove Mr. Lee's member-

11. *Laumer v. United States,* 409 A.2d 190 (D.C.1979).

ship. There's no one here to object about that.

The trial court went on to conclude, however, that the statements would not be admitted as co-conspirator statements unless the government presented independent proof "that the conspiracy existed and that Mr. Doret was connected to it." In response to defense counsel's objection to the admission of "the reports by Feaster to [Sgt.] Wagner," and assertion of the "inconsistencies between what's reported to [Sgt.] Wagner and what's reported to [Sgt.] Hearron," the trial judge declared: "I don't think the inconsistencies are that dramatic with respect to saying that this account is a trust worthier account of the underlying transactions at issue." Nevertheless, because there were "such fundamental inconsistencies with respect to the real operative issues in [the case]," the judge limited the admissible statements to those concerning the argument about money. Doret's counsel placed two additional points on the record: (1) the police examined Feaster about a homicide, not drugs and the drug conspiracy; and (2) Feaster "basically shift[e]d the blame and the roles in this drug conspiracy to other people, most particularly Gill [Doret]."

During his trial testimony, Sgt. Wagner again described his interview with Feaster, and revealed that an argument between Lee and Doret, during which Feaster was present, had occurred. When government counsel asked, "[W]hat was it that Mr. Feaster told you he said during the argument," defense counsel objected and both counsel were called to the bench for a conference. The trial judge reminded them that he had already ruled, in part, as to whether what Feaster told Sgt. Wagner could be admitted as a declaration against penal interest, and had indicated that the first two factors of the *Laumer, supra,* test had been met. The judge advised that he had completed his analysis of the third factor, concluding as follows:

I should say primarily that I have certainly heard abundant evidence already from co-conspirators and from other witnesses for me to make the appropriate finding under *Butler v. United States*[12] [that] the government has introduced compelling independent non-hearsay evidence establishing, one, that a conspiracy existed to possess with intention to distribute a controlled substance, cocaine; [and] two, Mr. Doret's connection with the conspiracy. And I have previously ruled with respect to[,] not the subsequent report[,] but the specific statements made[,] that these few statements were made during the course of and in furtherance of the conspiracy while the conspiracy at that time was ongoing. So I think you can elicit it.

After the bench conference, Sgt. Wagner was asked, and he answered the following questions pertinent to the declaration against penal interest issue:

Q. During that argument when Derrick Feaster, Marcus Lee and Gilbert Doret [were] present, what was it that Marcus Lee said?

A. He said that he had never been paid for his, for working for Gill, meaning selling the drugs, and that he was going to keep his share that he had earned by selling the drugs on the street for himself since Gill had never given him any money and he wasn't going to turn the profits over to Gill.

Q. How much money was being discussed?

A. Fourteen hundred dollars.

Q. And what was Derrick Feaster's statement?

A. He sided with Marcus. He also was a street level dealer and his complaint was the same, that Gill should pay the runners.

Q. And what did Gilbert Doret say?

A. He wanted his money.

---

12. *Butler v. United States,* 481 A.2d 431 (D.C. 1984).

At the conclusion of Sgt. Wagner's testimony, the trial judge revisited the declaration against penal interest issue, saying that he wanted to make it clear on the record that, "I made findings under *Laumer* with respect to these statements being trustworthy and reliable despite [the] objections [of defense counsel] ... with respect to some inconsistencies."

■■■ In light of the aforementioned factual background concerning the declaration against penal interest issue, Doret argues that the trial court made the following four errors in admitting, as declarations against penal interest, statements allegedly made by Feaster, revealing statements made in Feaster's presence by Doret and Lee, which Feaster recounted for Sgt. Wagner, who attempted to repeat them during Doret's trial. The errors were that the trial judge: (1) "considered the police investigation as a whole to corroborate ... Feaster's statement"; (2) "refused to consider the significant discrepancies between ... Feaster's verbal statement to Sergeant Wagner and his written statement to Detective Hearron, in particular, the facts that ... Lee had the gun, and that ... Feaster, not ... Lee, was arguing with [a]ppellant"; (3) failed to "consider[ ] the fact that Sergeant Wagner['s] interest was in solving the murder, for which ... Feaster blamed [Doret], and not on the drug trafficking"; and, in addition, (4) "the testimony ultimately admitted at trial primarily involved [Doret] and ... Lee[,]" rather than Feaster. In advancing his argument, Doret relies on both the evidentiary law of hearsay, and the Sixth Amendment Confrontation Clause.[13] The government's response contends that the trial judge "did not clearly err when

he found that Feaster's statements to [Sgt.] Wagner were statements against Feaster's penal interest." In support of its position, the government asserts that: (1) the statements "implicated [Feaster] in the [drug] conspiracy," and thus, "expose[d][him] to criminal liability"; (2) rather than considering the police investigation to determine whether there was corroboration for Feaster's statement, the trial judge depended on "the circumstances surrounding the making of the statement [to] corroborate its trustworthiness"; (3) the trial court properly considered, and took into account, (as evidenced by exclusion of statements regarding a gun that Feaster said Lee took from the Center Street apartment right after the argument involving Doret, Lee and Feaster), "discrepancies between the statements made to Sergeant Hearron and [Sgt.] Wagner, and deemed them largely immaterial"; (4) Sgt. Wagner did not focus solely on Lee's murder, as evidenced by the fact that he posed an initial general question to Feaster: "What is this all about and what happened"; and (5) *Laumer* permits the establishment of trustworthiness through "reference to ... corroborating evidence in the whole case."

■■■ Under the applicable standard of review, our task is to determine whether the trial court's factual findings regarding the alleged declarations against the penal interest of Feaster were "clearly erroneous" under the hearsay evidentiary law, assuming that Doret did not preserve his Sixth Amendment Confrontation Clause argument, as the government contends. *Harris v. United States*, 668 A.2d 839, 843 (D.C.1995); *Laumer, supra*, 409 A.2d at

---

13. The government takes the position that Doret abandoned the constitutional basis because he did not specifically mention the Confrontation Clause in his opening brief. In his reply brief, Doret denied having abandoned the constitutional ground for his objection to the admission of the statements against penal interest. We are satisfied that Doret preserved the Sixth Amendment Confrontation Clause basis for his objection. At the pre-trial hearing on his motion to exclude the statements, Doret's counsel clearly stated to the trial judge: "I need to make sure my position is crystal clear, Your Honor. We would be asserting, of course, both hearsay and Sixth Amendment right to confrontation issues to testimony by police officers as to statements made by Mr. Feaster after the events about which Mr. Feaster is speaking."

203 ("[I]n reviewing the trial court's ruling on the admissibility of declarations against penal interest, we will not disturb the trial court's findings unless they are clearly erroneous") (citing D.C.Code § 17–305(a) (1973)). However, "the trial court's conclusion that a statement is against the declarant's penal interest is clearly a legal question." *Laumer, supra,* 409 A.2d at 203; *see also United States v. Barone,* 114 F.3d 1284, 1296 (1st Cir.1997) (referencing *United States v. Costa,* 31 F.3d 1073, 1077 (11th Cir.1994)) ("(The question whether a statement is against penal interest is a question of law, reviewable *de novo* )"). Thus, we review the legal issue *de novo.* Furthermore, assuming that Doret preserved his Sixth Amendment Confrontation Clause argument and did not abandon it on appeal, we must examine whether this right was violated by the erroneous admission of Feaster's statements as declarations against penal interest. In addition, if we find error, we must decide whether that error was harmless.

Our review of the applicable legal principles governing issues relating to Feaster's alleged declarations against his penal interest reveals that courts generally have adhered to a cautious, skeptical approach to "[h]earsay evidence, the in-court testimony of an out-of-court statement offered to prove the truth of the matter asserted ...," *Laumer, supra,* 409 A.2d at 194, because, even if the statement falls within a recognized exception to the hearsay rule, it may be unreliable and untrustworthy. Thus, when we adopted the declaration against penal interest exception to the hearsay rule in *Laumer, supra,* as set forth in FED.R.EVID. 804(b)(3),[14] we held that: "A statement tending to expose the declarant to criminal liability and offered

as tending to exculpate the accused is admissible when the declarant is unavailable and corroborating circumstances clearly indicate the trustworthiness of the statement." *Id.* at 199. A similar concern for the reliability and trustworthiness of evidence introduced against an accused governs constitutional Confrontation Clause analysis under the Sixth Amendment: " 'The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact.' " *Lilly v. Virginia,* 527 U.S. 116, 123–24, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (quoting *Maryland v. Craig,* 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990)). Thus,

> When the government seeks to offer a declarant's out-of-court statements against the accused, and, as in this case, the declarant is unavailable, courts must decide whether the Clause permits the government to deny the accused his usual right to force the declarant "to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth.' "

*Id.* (plurality opinion, quoting *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)) (footnote and citation omitted).

The evidentiary hearsay and Confrontation Clause analyses of the corroboration issue are quite similar, if not identical in some instances, especially in the concern for the reliability and trustworthiness of hearsay statements. As the Sixth Circuit said in *United States v. McCleskey,* 228 F.3d 640, 643 (6th Cir. 2000): "The law construing the Sixth Amendment right of

---

**14.** Fed.R.Evid. 804(b)(3) provides in pertinent part:

>  (b) **Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>  (3) **Statement against interest.** A statement which ... at the time of its making ... so far tended to subject the declarant to ... criminal liability, ... that a reasonable

person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

confrontation and the evidentiary law of hearsay run along parallel lines. A violation of one is generally, although not always, a violation of the other." Thus, some inculpatory statements may "lack the requisite degree of reliability to satisfy the confrontation clause," yet "pass muster under Fed.R.Evid. 804(b)(3)." *Lyons, supra,* 514 A.2d at 430 n. 13 (citing FED.R.EVID. 804(b)(3) advisory committee note, ¶ 4 ... ); *United States v. Coachman,* 234 U.S.App.D.C. 194, 198 & n. 12, 727 F.2d 1293, 1297 & n. 12 (1984). *See also Idaho v. Wright,* 497 U.S. 805, 814, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) ("The Confrontation Clause ... bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule.").

This court's approach to the admissibility of declarations against penal interest, under evidentiary hearsay law, is consistent with that of the Supreme Court, recently reiterated in *Lilly, supra:* "[T]he veracity of hearsay statements is sufficiently dependable to allow the untested admission of such statements against an accused when (1) 'the evidence falls within a firmly rooted hearsay exception'[15] or (2) it contains 'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything, to the statements' reliability." *Lilly, supra,* plurality opinion, 527 U.S. at 124–25, 119 S.Ct. 1887 (quoting *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65

L.Ed.2d 597 (1980)). With regard to the category of statements against penal interest, "offered by the prosecution to establish the guilt of an alleged accomplice of the declarant," *id.* at 127, 119 S.Ct. 1887, the Supreme Court stated that such "statements ... are inherently unreliable," *id.* at 131, 119 S.Ct. 1887,[16] and reiterated its holding in *Williamson, supra:* "[I]n *Williamson,* ... without reaching the Confrontation Clause issue, we held that an accomplice's statement against his own penal interest was not admissible against the defendant ... [because of] ... the presumptive unreliability of the 'non-self-inculpatory' portions of the statement...." *Lilly, supra,* 527 U.S. at 133, 119 S.Ct. 1887. *See also United States v. Hammond,* 681 A.2d 1140, 1146 (D.C.1996). Although such statements are presumptively unreliable,

> this does not mean ... that the Confrontation Clause imposes a 'blanket ban on the government's use of [nontestifying] accomplice statements that incriminate a defendant.' Rather, it simply means that the Government must satisfy the second prong of the ... *Roberts,* [*supra*], test in order to introduce such statements.

*Lilly, supra,* 527 U.S. at 134, 119 S.Ct. 1887. In that regard, the focus, under a state's evidentiary hearsay law, on "the context of the facts and circumstances under which [the statements against penal interest were] given," *id.* at 135, 119 S.Ct.

---

**15.** In discussing whether the declaration against penal interest falls into the "firmly rooted hearsay exception" category, the Supreme Court stated:

> The "against penal interest" exception to the hearsay rule—unlike other previously recognized firmly rooted exceptions—is not generally based on the maxim that statements made without a motive to reflect on the legal consequences of one's statement, and in situations that are exceptionally conducive to veracity, lack the dangers of inaccuracy that typically accompany hearsay. The exception, rather, is founded on the broad assumption "that a person is unlikely to fabricate a statement against his own interest at the time it is made."

Furthermore, the court emphasized:

> The decisive fact, which we make explicit today, is that accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence.

**16.** The other two categories of statements against penal interest, specified in *Lilly, supra,* are those offered "(1) as voluntary admissions against the declarant; [and] (2) exculpatory evidence offered by a defendant who claims that the declarant committed, or was involved in, the offense." *Id.* at 127, 119 S.Ct. 1887.

1887, and "the 'surrounding circumstances' of the statements," *id.* at n. 6 (quoting *Wright, supra,* 497 U.S. at 820, 110 S.Ct. 3139), "is virtually identical to the [second prong of the] *Roberts* [test requiring a showing of] 'particularized guarantees' " of [trustworthiness]; *id.* at 135, 119 S.Ct. 1887, "such that adversarial testing would be expected to add little, if anything, to the statement's reliability." *Id.* at 124, 119 S.Ct. 1887.

■■■■ This jurisdiction's evidentiary hearsay law also requires a fact-intensive determination of the surrounding circumstances in which the declarations were made, and, in particular, the trustworthiness of statements against penal interest. *See Hammond, supra,* 681 A.2d at 1146. The factors governing the admission of declarations against penal interest under our evidentiary hearsay law were set forth in *Laumer, supra,* when we adopted the exception to the hearsay rule: "[T]he trial judge [must] undertake a three-step inquiry to ascertain (1) whether the declarant, in fact, made a statement; (2) whether the declarant is unavailable; and (3) whether corroborating circumstances clearly indicate the trustworthiness of the statement." *Id.* at 199. We reiterated this three-step process in *Lyons v. United States,* 514 A.2d 423 (D.C.1986) when we concluded that "a statement against the declarant's penal interest tending to *inculpate* [the] appellant . . ." also may be admissible if it is reliable. *Id.* at 428 (emphasis in original).

In the case before us, we must decide whether the statements attributed to Feaster, which were both self-inculpatory as to Feaster, and inculpatory as to Doret and Lee, were properly admitted into evidence, through the testimony of Sgt. Wagner, as declarations against Feaster's penal interest; and, in particular, "[whether] there are corroborating [or surrounding] circumstances [that] clearly indicate the trustworthiness of the statement[s]," *Laumer, supra,* 409 A.2d at 200; *see also Lilly, supra,* 527 U.S. at 135, 119 S.Ct.

1887; or whether the statements may be deemed to have " 'particularized guarantees' of trustworthiness such that adversarial testing would be expected to add little, if anything, to the statement[s'] reliability." *Id.* at 124, 119 S.Ct. 1887. We note at the outset of our analysis that the first two steps of *Laumer's* three-step inquiry are not at issue here. With respect to the first, that "the declarant in fact made a statement," *Laumer, supra,* 409 A.2d at 199, the trial court clearly credited the testimony of Sgt. Wagner in concluding that the statements, concerning the alleged argument involving Lee, Doret and Feaster, were made by Feaster. The trial court's emphasis on Sgt. Wagner's credibility in reaching its conclusion is consistent with what we said in *Laumer:* "In determining whether the declarant in fact made the proffered statement, the trial court's focus is not on the truth of the declaration, but on the veracity of the witness who repeats the declaration." *Id.* As for the second factor, Feaster clearly was unavailable due to his death prior to trial. Thus, our central concern is whether the third *Laumer* requirement has been met.

Under the third *Laumer* requirement, the "corroborating circumstances [must] clearly indicate the trustworthiness of the statement," *id.;* or in the language of *Lilly* and *Roberts, supra,* there must be a showing of " 'particularized guarantees' of trustworthiness such that adversarial testing would be expected to add little, if anything, to the statement[s'] reliability." *Lilly, supra,* 527 U.S. at 124, 119 S.Ct. 1887. Of the three, non-exhaustive factors, *Laumer, supra,* 409 A.2d at 203, set forth in *Laumer* to assess the corroborating circumstances and trustworthiness of the statements, two are important to our consideration of Feaster's statements: (a) " 'the existence of corroborating evidence in the case' "; and (b) " 'the extent to which the declaration is really against the declarant's penal interest.' " *Id.* at 200 (quoting *United States v. Guillette,* 547 F.2d 743, 754 (2d Cir.1976), *cert. denied,*

434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977) (other citation omitted)). With respect to the latter factor, which in many respects is intertwined with the first, Doret maintains that, "the testimony ultimately admitted at trial primarily involved [Doret] and ... Lee[,]" rather than Feaster. Hence, it was not really against Feaster's interest. Our application of this factor is guided by principles enunciated in *Williamson, supra:* (1) "[W]hether a statement is self-inculpatory or not can only be determined by viewing it in context"; and (2) "The question under Rule 804(b)(3) is always whether the statement was sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true,' and this question can only be answered in light of all the surrounding circumstances." 512 U.S. at 603–04, 114 S.Ct. 2431.

■■■ Feaster's alleged specific words, "Yes, you have not ever paid him. So he don't owe you anything," were not introduced through the trial testimony of Sgt. Wagner. Rather, Sgt. Wagner gave his own rendition of Feaster's position during the alleged argument involving Lee, Doret and Feaster: "He sided with Marcus. He also was a street level dealer and his complaint was the same, that Gill should pay the runners." Sgt. Wagner's narrative rendition of what Feaster purportedly said, is not obviously against Feaster's penal interest to the extent that he would be subjected to criminal liability based on his own explicit admission, because the officer's narrative contains no direct admission, attributable to Feaster, that he was a street level dealer. *See* WEINSTEIN'S FEDERAL EVIDENCE, § 804.06[1], at 804–47, 2d ed., vol. 5 (Lexis Publishing 2000) ("State-

ments against interest are admissible because it is presumed that one will not make a statement damaging to one's self unless it is true."); *Williamson, supra,* 512 U.S. at 603–04, 114 S.Ct. 2431; *Chambers v. Mississippi,* 410 U.S. 284, 299, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (Declarations against interest are "founded on the assumption that a person is unlikely to fabricate a statement against his own interest at the time it is made."). · Moreover, the statements attributed to Lee and Doret, during Sgt. Wagner's trial account of Feaster's conversation with the police officer, did not specifically implicate Feaster in a damaging way that exposed Feaster to criminal liability: (1) Sgt. Wagner's testimony about what Lee purportedly said in the presence of Feaster—"He said that he had never been paid for his, for working for Gill, meaning selling drugs, and that he was going to keep his share that he had earned by selling the drugs on the street for himself since Gill had never given him any money and he wasn't going to turn the profits over to Gill"; (2) Sgt. Wagner's testimony about what Doret reportedly said in Feaster's presence—"He wanted his money." These statements centered on the dispute between Lee and Doret, and without more, did not tend to expose Feaster to criminal liability.[17]

Even if all three statements made by Feaster, as recounted at trial by Sgt. Wagner, may be properly viewed as against his penal interest at the time they were made, because they "would [have] be[en] probative in a trial against [him]," *see United States v. Fujii,* No. 00–CR–17, 2000 U.S. Dist. LEXIS 14576, at 4, 2000 WL 1468736 at *2 (D.N.D.Ill. October 2, 2000) (citing *United States v. Garcia,* 897 F.2d 1413, 1420 (7th Cir.1990)), the issue is whether corroborating or surrounding circum-

---

**17.** The fact that Feaster took Lee's side in the argument with Doret indicates that Lee and Feaster may have been friends, or that they had a common complaint against Doret, and that after Lee's death Feaster may have desired revenge against Doret for killing Lee. Under these circumstances, Feaster had a

motive to implicate Doret. Thus, the assumption underlying a declaration against penal interest—that Feaster would not have made the declarations concerning the argument between Doret and Lee had they not been true—may be questioned.

stances existed at the time of Feaster's alleged declarations so that all of his statements that were admitted into evidence against Doret may be deemed to have particularized guarantees of trustworthiness. Doret contends that the statements admitted as declarations against Feaster's penal interests do not have guarantees of trustworthiness, and that the trial court (1) erred in taking into account the police investigation as a whole; (2) failed to take into proper account the discrepancies between Feaster's statements to Sgt. Wagner and Sgt. Hearron; did not properly consider Sgt. Wagner's interest in solving Lee's murder rather than focusing on the drug operation; and (3) overlooked Feaster's attempt to shift the blame elsewhere by implicating Doret in the controversy over drug money. Before considering these contentions, we highlight some pertinent principles that will guide our analysis.

In *Hammond, supra,* during our discussion of evidentiary hearsay principles and reliability issues, "we recognized" that "inculpatory references to a third party which are made within a broader self-inculpatory statement ... are suspect at best," because they may be " 'merely attempts to shift blame or curry favor.' " *Id.* at 1145 (citing *Williamson, supra,* 512 U.S. at 603, 114 S.Ct. 2431). As we reiterated in *Hammond,* " 'One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature.' " *Id.* (quoting *Williamson, supra,* 512 U.S. at 599–600, 114 S.Ct. 2431). Given the suspect nature of these self-inculpatory references that also implicate the defendant, the principle applied in the Fifth Circuit is instructive: "Under [Fed.R.Evid.] 804(b)(3), trustworthiness is determined primarily by analysis

of two elements: the probable veracity of the in-court witness, and the reliability of the out-of-court declarant." *United States v. Alvarez,* 584 F.2d 694, 701 (5th Cir.1978) (citation omitted). With respect to the corroboration factor, we said in *Harris, supra:* "In order to determine whether the corroboration factor has been met, the trial court may look at the time the statement was made and to whom it was made, the existence of corroborating evidence in the case, and the extent to which the declaration is truly against the declarant's penal interest." *Id.* at 843 (citing *Laumer, supra,* 409 A.2d at 200) (other citation omitted).

A similar concern for reliability and trustworthiness, sometimes with a slightly different emphasis, governs confrontation clause analysis. " '[T]o be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial.' " *McCleskey, supra,* 228 F.3d at 645 (quoting *Wright, supra,* 497 U.S. at 822, 110 S.Ct. 3139).[18] "Thus, we must look to the statement itself and to the circumstances of its delivery for evidence of its inherent reliability." *Id.* In other words, there must be " 'a showing of particularized guarantees of trustworthiness,' " 497 U.S. at 816, 110 S.Ct. 3139 (quoting *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)), which "must ... be drawn from the totality of the circumstances that surround the making of the statement[s] and that render the declarant particularly worthy of belief." *Id.* at 820, 110 S.Ct. 3139. Consistent with confrontation clause analysis, hearsay evidentiary analysis under FED.R.EVID. 804(b)(3), in determining trustworthiness, also focuses on

---

**18.** At least the first circuit and one United States District Court have applied a similar standard to hearsay evidentiary analysis under FED.R.EVID. 804(b)(3): " 'The corroboration that is required by Rule 804(b)(3) is not independent evidence supporting the truth of the matters asserted by the hearsay state-

ments, but evidence that clearly indicates that the statements are worthy of belief, *based upon the circumstances in which the statements were made.*' " *Fujii, supra,* 2000 Dist. LEXIS 14576, at 17, 2000 WL 1468736 at *5 (quoting *United States v. Barone,* 114 F.3d 1284–1300 (1st Cir.1997) (emphasis added)).

the circumstances in which the declaration against penal interest is made. *See United States v. Casamento,* 887 F.2d 1141, 1170 (2d Cir.1989) ("In determining whether ... [the] statement is trustworthy enough to be admissible, the district court must look to the circumstances in which the declarant made the statement.").

In applying the factors of "reliability" and "trustworthiness," or "particularized guarantees of trustworthiness," we are cognizant that, unlike this case, "[t]he ordinary Rule 804(b)(3) statement against interest ... inculpates the declarant and either explicitly or implicitly exculpates the defendant on trial." *McCleskey, supra,* at 644. *McCleskey* is helpful with regard to our analysis of Doret's case. The government in *McCleskey* introduced a statement which not only inculpated the declarant, but also the defendant. The case concerned a charge of conspiracy to possess cocaine with intent to distribute it, and involved two men who were stopped for speeding, and were arrested after they consented to the search of the vehicle. The police found six kilograms of cocaine in a duffel bag in the car's trunk. One man, who had been given his *Miranda*[19] warnings, gave a statement to the police at the headquarters of the St. Louis County Police Department "drug office." He recounted taking part in four trips during which he transported cocaine for defendant McCleskey; later, he recanted the statement. The statement was admitted into evidence during McCleskey's trial. The Sixth Circuit held that the admission of the statement constituted error under FED.R.EVID. 804(b)(3) because:

[W]here, as here, it is the government which seeks to introduce a statement, otherwise hearsay, which inculpates its declarant ... by spreading or shifting onto him some, much, or all of the blame, the out-of-court statement entirely lacks ... indicia of reliability. It is garden variety hearsay as to the defendant and it does not lose that character merely because it in addition reliably inculpates the declarant.

*McCleskey, supra,* at 644. *McCleskey* has similarities and dissimilarities with respect to the case before us.

Unlike the declarant in *McCleskey,* Feaster was not under arrest when he made his statement. Nor, according to the police testimony, was he a suspect in Lee's murder. Nonetheless, when he went to the V Street address, he was introduced to Sgt. Wagner, in the presence of two other police officers, by Joyce Cristwell, who later became a witness for the prosecution during Doret's trial.[20] The record shows, contrary to the government's assertion, that Feaster "had invited the police to the stash house that he himself used," that in fact Sgt. Wagner had "suggested" the visit to the crack house.[21] It was there that Feaster implicated Doret and Lee in the same drug operation. It was apparently there, also, that Sgt. Wagner asked Feaster, "Have you ever been locked up? ... Under what name?" Feaster responded to both questions, in addition to one which inquired as to the reason for his arrest.

Although the trial judge painstakingly parsed the testimony of Sgt. Wagner and

**19.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**20.** On cross-examination during trial, Sgt. Wagner testified that he had a "professional" relationship with Ms. Cristwell, that "[she] had already talked to [him] about the offense," and that she informed him that Feaster was at the V Street location.

**21.** During his cross-examination at the pretrial hearing, Sgt. Wagner had the following exchange with Doret's counsel:

Q. How did the subject of Center Street [the crack or stash house] come up?
A. He told me about it.
Q. Was it the first thing he said to you was, "Let us go up to Center Street"?
A. No, I suggested that we go there....He just told me about the murder and all about the drugs and the argument and all that kind of stuff and the safe and those kind of things and the stash house. So, I asked him to show it to me.

Sgt. Hearron, during the pre-trial hearing, so that only a few of the statements attributed to Feaster were to be admitted into evidence, we conclude that the trial court clearly erred in admitting into evidence, as declarations against Feaster's penal interest, not only his supposedly self-inculpatory statement, but also his two statements inculpating Lee and Doret in the drug operation, because the government failed to demonstrate that "corroborating circumstances [existed that] clearly indicate[d] the trustworthiness of the statement[s]," [22] *Laumer, supra,* 409 A.2d at 200; or that the statements were surrounded by " 'particularized guarantees of trustworthiness' such that adversarial testing would be expected to add little, if anything, to the statement[s'] reliability." *Lilly, supra,* 527 U.S. at 125, 119 S.Ct. 1887 (quoting *Roberts, supra,* 448 U.S. at 66, 100 S.Ct. 2531). We recognize that a trial judge has "considerable discretion" in examining the reliability of alleged hearsay statements; however, that discretion must be exercised "within the parameters of the rules of evidence...." *United States v. Vretta,* 790 F.2d 651, 659 (7th Cir.1986). In the case before us, rather than focus on "the circumstances in which the statements were made," *Fujii, supra,* at 17, 2000 WL 1468736 at *5 (emphasis re-

moved); *Casamento, supra,* at 1170, or "the circumstances of [the statements'] delivery," *McCleskey, supra,* the trial court looked to the results of the police investigation and, in particular, relied on a fingerprint from inside the safe found at the crack house, and the testimony of other witnesses who described the drug operation, to find that the reliability and trustworthiness corroboration factors were met. No mention was made of the circumstances which surrounded Feaster's conversation with Sgt. Wagner, that may have prompted him to (1) deflect attention from himself with respect to circumstances surrounding the murder of Doret, since the murder appeared to be Sgt. Wagner's sole, or at least main focus; or (2) "curry favor" with Sgt. Wagner, or "to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." *Hammond, supra,* 681 A.2d at 1145. Furthermore, although Sgt. Wagner testified that Feaster took Lee's side during the argument involving Lee, Doret and Feaster, Sgt. Hearron stated at the pre-trial hearing, that when the issue of the fifteen hundred dollars allegedly owed to Lee was discussed, "I don't believe Mr. Feaster was involved in that part of the argument. He was listening to

22. There is some confusion in the transcripts as to whether the trial court admitted Feaster's statements attributed to Lee and Doret as declarations against his penal interest, or as co-conspirator statements. At the preliminary hearing, the trial judge stated: "The more troublesome issue is whether or not these statements are admissible independently, either under *Williamson* or as co-conspirator statements that would be admissible against Mr. Doret." In ruling at trial that all three of the statements could come in, the trial court cited *Butler, supra,* and referenced "compelling independent non-hearsay evidence establishing, one, that a conspiracy existed to possess with intention to distribute a controlled substance, cocaine; two, Mr. Doret's connection with the conspiracy." Later, at the conclusion of Sgt. Wagner's testimony, and after discussing some housekeeping matters with the jury, the trial judge appeared to state that he admitted the statements as declarations against penal interest:

[I]f someone just decided to order the transcript of what we just talked about here and not the transcript of our earlier discussion, then the appellate record will look barren with respect to [whether] I ever gave any thought to these issues and had determined that they were declarations against penal interest based upon the testimony that I learned out of the presence of the jury, that I thought they were co-conspirator statements, that the declaration against penal interest was a firmly rooted exception. I made findings under *Laumer* with respect to these statements being trustworthy and reliable despite [defense counsel's] objections noted with respect to some inconsistencies.

In his brief, Doret indicated that he "does not contest [the trial court's ultimate] finding" that the statements pertaining to the argument between Lee and Doret were admissible as con-conspirator statements.

what Gil [Doret] and Marcus [Lee] were talking about." This discrepancy between Sgt. Wagner's and Sgt. Hearron's pre-trial testimony cast doubt on what Feaster and the others actually said during the alleged argument.

Moreover, Sgt. Wagner's narrative testimony at trial about the argument involving Doret, Lee and Feaster, was more extensive than the three statements which the trial judge approved for admission at trial. During the pre-trial hearing, as we have previously indicated, the trial judge ruled that the following statements attributed to Feaster could be admitted at trial as declarations against Feaster's penal interest: (1) Lee told Doret, "He thought he deserved to keep the money because he had not been paid"; (2) Feaster said to Doret, "Yes, you have not ever paid him. So he don't owe you anything"; and (3) Doret informed Lee that, "He wanted his money." By giving a narrative rendition, rather than focusing on Lee's actual words, Sgt. Wagner related more than the trial judge had approved for admission as Feaster's declaration against his own penal interest. Similarly, when it came to articulation of what Feaster had said during the argument involving Lee, Doret and Feaster, Sgt. Wagner testified at trial that: "He [meaning Feaster] sided with Marcus. He was also a street level dealer and his complaint was the same, that Gill should pay the runners." As shown above, this narrative statement is in contrast with that approved for admission at trial by the trial judge, which was directly attributed to Feaster by Sgt. Wagner: "Yes, you have not ever paid him. So he don't owe you anything." Indeed, the only statement with respect to the Lee, Doret, Feaster argument, that Sgt. Wagner recounted in verbatim fashion, as approved by the trial judge at the pre-trial hearing, was that allegedly conveyed by Doret: "He wanted his money." This statement, that Doret "wanted his money," provided a powerful motive for the murder of Lee. Furthermore, Feaster's complaint, that Doret

owed him money also, revealed Feaster's substantial bias against Doret.

In sum, the admission of testimony pertaining to an alleged argument involving Lee, Doret and Feaster, through Sgt. Wagner as declarations against Feaster's penal interest, lacked guarantees of trustworthiness, and was "clearly erroneous." *Harris, supra.* In addition, the admission of the alleged statements violated Doret's Sixth Amendment Confrontation Clause rights, *McCleskey; Lilly, supra,* because Doret had no opportunity to " 'subject[ ] [them] to rigorous testing in the context of an adversary proceeding before the trier of fact.' " *Lilly, supra,* 527 U.S. at 123–24, 119 S.Ct. 1887 (quoting *Craig, supra,* 497 U.S. at 845, 110 S.Ct. 3157).

Having determined that the trial court erred in admitting the statements attributed to Feaster as declarations against his penal interest, we turn now to the question whether the error was harmless. We conclude that under the *Kotteakos, supra,* 328 U.S. at 776, 66 S.Ct. 1239, non-constitutional error standard (whether the error had a "substantial and injurious effect or influence in determining the jury's verdict"), even if we assume that Doret did not preserve his Sixth Amendment Confrontation Clause argument, or that he abandoned it on appeal, the trial court's admission of Feaster's alleged statements as declarations against his own penal interest did not constitute harmless error under a hearsay evidentiary analysis.

The statements attributed to Feaster, presented as declarations against Feaster's own penal interest during the testimony of Sgt. Wagner, the government's witness, provided the motive for Doret's alleged murder of Lee, that is, Doret's argument with Lee about the fourteen or fifteen hundred dollars that Lee allegedly owed Doret for drug sales. No other witness whose testimony was presented at trial rendered the same account of the alleged argument. Darren Hargrove, one of the persons who stated that he sold drugs from the Newton Street crack

house, and who entered a guilty plea to a lesser charge and testified for the government, was asked about a July 1990 visit to the Newton Street apartment. Hargrove recalled an argument in July 1990, but could not remember the specific date on which the argument occurred. He thought it might have been "either the night before, the day before, or—it was before [Lee] got killed." Moreover, he "believe[d]" that the argument was between Doret and Feaster, although he, Doret, Feaster and "Mark" were present. In describing the argument, Hargrove stated: "We was just talking and arguing." Eugene Frazier, another member of the group, who also entered a guilty plea to a lesser charge, and testified under a grant of immunity,[23] was asked if he remembered a July 9th discussion "in the park" "between Mr. Doret and Marcus Lee about the funds received from distributing narcotics?" He replied:

> There was a question of—there was basically a discussion about an amount of money that was owed and . . . it wasn't really a big issue, but it was just a question of Marcus had wanted his money during that time and there wasn't no financing there to give. And Gill was trying to explain that to him, you know. And Marcus got really upset and . . . he started yelling. And, of course, . . . Gill . . . was yelling back. And at that point, . . . I was really gone pretty much. . . . But that wasn't something that to me was uncommon because . . . we all did

that, we all argued about something or another.

While Frazier's testimony reveals that an argument over money took place between Lee and Doret, it also indicates that such arguments were not "uncommon." Furthermore, Frazier does not indicate the exact exchange of words between Lee and Doret, so it is impossible to determine whether the argument was so intense that reasonable jurors could infer that Doret was bent on killing Lee.

Perhaps the most compelling testimony against Doret at trial came from Lee's mother who was speaking with her son by telephone at the time he was killed. Even though Lee's mother testified that her son specifically stated that Gill was coming toward him while he was talking with her, no reason or motive for his murder was conveyed, or could reasonably be discerned from the conversation between mother and son. In addition, although Lee's mother testified at trial that she heard the sound of a gunshot while speaking with her son, the evidence showed that the statement she gave to the police right after her son was murdered cast doubt on whether she actually heard a gunshot during the telephone conversation. Furthermore, there was no direct evidence that Doret murdered Lee. Thus, without probative circumstantial evidence,[24] or the admission of Feaster's alleged declarations against penal interest, indicating that Doret "wanted

---

**23.** On cross-examination, Frazier was asked why the government "g[o]t a formal grant of immunity for [him]?" He recounted a discussion he had in November 1996 with an Assistant United States Attorney:

> This is basically what happened. When I was talking to [the Assistant] we was talking about the specifics of the case and within that time we were discussing stuff about narcotics and drugs. I mean me really having no understanding of the law, I don't know anything happening to me in 1990 concerning narcotics can affect me now, in 1996, 1997, so I say is there anything that we can do that the stuff that I did from 1990 won't be held against me in 1996 and '97. Now, in reality I don't know if it even

applies, I don't even know if the immunity really mean anything, okay, outside of what you're using it for. But I don't know those things. I'm not in law.

Subsequent to that conversation, Frazier was given a letter from the prosecutor specifying that he would not be prosecuted for what he relayed to the government.

**24.** While the government sought to establish that a pistol was seen in the Center Street crack or stash house on July 13, 1990, two days after Lee's murder, and to infer that the pistol belonged to Doret, the jury acquitted him of the charge of carrying a pistol without a license on July 13, 1990.

his money," reasonable jurors would be left to ponder what was the reason for the murder and to question whether sufficient evidence existed to convict Doret of first-degree murder (premeditated) while armed. Thus, we are unable to say that the error in admitting the statements attributed to Feaster did not have "substantial and injurious effect or influence in determining the jury's verdict," *Kotteakos, supra; see also Clayborne v. United States,* 751 A.2d 956, 970 (2000) (reversal is not required if "we can say with the requisite 'fair assurance' that [the appellant] was not substantially prejudiced by the trial court's [error]....."). Accordingly, we are constrained to reverse Doret's convictions for first-degree murder (premeditated) while armed, and PFVC; and to remand the case to the trial court for a new trial on those charges.

### Doret's Other Arguments

We are satisfied that none of Doret's other arguments require reversal of his convictions for conspiracy to distribute cocaine, PWID, and unlawful possession of ammunition. Doret contends that the evidence was insufficient to convict him of the drug charges because: (1) the "single ziplock bag" recovered from the Center Street apartment was insufficient to support the distribution of cocaine charge because the contents of the ziplock were found only to be "consistent with an amount for personal use"; and (2) the trial court abused its discretion in admitting evidence of his latent fingerprints from envelopes inside the Center Street safe. We disagree. With respect to Doret's first argument, we have previously held that: "packaging of narcotics in a manner making them ready to sell to individual purchasers is strong evidence of an intent to distribute." *Taylor v. United States,* 662 A.2d 1368, 1371 (D.C.1995) (citation omitted). Viewing the evidence in the light most favorable to the government, as we must, *see Owens v. United States,* 688 A.2d 399, 402 (D.C.1996), we conclude that there was ample evidence beyond a reasonable

doubt to convict Doret of the drug charges, based, in part, on the testimony of: (1) Officer Joe L. Henderson that in searching the Center Street apartment, he discovered "a safe, a scale, a bag with some plastic bags in it and some rubber gloves"; (2) Sgt. Wagner that "there were numerous small ziplock bags [found at the apartment], the kind that are used to package narcotics for street sales of [ ] crack cocaine ....," and that one ziplock bag contained "traces of white powder ... that was field tested positive for cocaine"; (3) Officer Tyrone R. Thomas that the amount of cocaine found at the apartment was a usable amount, and that the safe, scale, surgical gloves, safe and ziplock bags were used by drug dealers; and (4) Eugene Frazier and Darren Hargrove that they routinely "sold drugs together" with Doret, and that Doret was "the leader" of the group. *See Price v. United States,* 746 A.2d 896, 899 (D.C.2000) ("The government need not prove the presence of a usable amount of the controlled substance ... though if the government does establish such usability[,] it will have met its burden, since 'if a substance is usable it is also measurable'") (citation and internal quotations omitted); *Barnes v. United States,* 760 A.2d 556, 558 n. 3 (D.C.2000) ("The quantity and packaging of the drugs, together with the discovery of the cutting and packaging paraphernalia, was more than sufficient to show the required intent.").

With regard to Doret's argument pertaining to the admission of his latent fingerprint, we find no abuse of discretion. He asserts a relevancy argument regarding the fingerprint. However, " 'The evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great deal of deference to its decision.' " *Clayborne, supra,* 751 A.2d at 963 (quoting *Mercer v. United States,* 724 A.2d 1176, 1185 (D.C. 1999) (other quotation omitted)). Moreover, without the latent fingerprint, there

was testimony from Hargrove, Frazier and Cristwell that, on at least one occasion, they observed Doret handling either drugs or drug revenue at the Center Street apartment. Therefore, we cannot say that even if allowing testimony of the latent fingerprint constituted error, that it amounted to reversible error under *Kotteakos, supra*.

Finally, Doret argues that the trial court abused its discretion by permitting the government to introduce prejudicial evidence of his use of aliases, including Anthony Wayne Grant, because "[n]o witness identified [him] by any alias ... [or] referred to [him] by the name Grant." Contrary to Doret's assertion, Frazier identified Doret as "Anthony Grant," "Gill," or "Grant" throughout his testimony. Cristwell knew Doret only as "Gill" and used that name throughout her testimony. Thus, the use of the nicknames and aliases served the useful purpose of informing the jury, rather than " 'arous[ing] suspicion that the accused is a person who has found it useful or necessary to conceal his identity.' " *Johnson v. United States*, 389 A.2d 1353, 1355 (D.C.1978) (quoting *United States v. Grayson*, 166 F.2d 863, 867 (2d Cir.1948) (footnote omitted)). Even assuming error, we conclude that Doret suffered no recognizable prejudice warranting reversal. *See Kotteakos, supra; see also Reavis v. United States*, 395 A.2d 75, 79 n. 2 (D.C.1978).

Accordingly, for the foregoing reasons, we affirm Doret's convictions for conspiracy to distribute cocaine; possession with intent to distribute cocaine; and unlawful possession of ammunition. However, we reverse his convictions for first-degree murder (premeditated) while armed, and possession of a firearm during a crime of violence; and order a new trial on those charges.

*So ordered.*